STATE of Wisconsin,
Plaintiff-Respondent,

v.

Antonio D. BARBEAU,
Defendant-Appellant.†

Court of Appeals

*No. 2014AP2876–CR. Submitted on briefs February 10, 2016.
—Decided June 22, 2016.*

**2016 WI App 51**

(Also reported in 883 N.W.2d 520.)

† Petition for Review filed.

736

737

740

742

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Daniel R. Goggin II* of *Goggin & Goggin*, state public defender appointed appellate counsel, Neenah.

On behalf of the plaintiff-respondent,the cause was submitted on the brief of *Christopher G. Wren*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Neubauer, C.J., Reilly, P.J., and Hagedorn, J.

¶ 1. NEUBAUER, C.J. Antonio D. Barbeau, a few months shy of his fifteenth birthday, pleaded no contest to the first-degree intentional homicide of his great-grandmother. He was sentenced to life imprisonment with the right to seek release to parole supervision on his fiftieth birthday in 2048, after thirty-five years of imprisonment. Later, at the prodding of the Department of Corrections (DOC), the circuit court discovered that Barbeau was actually eligible for release to extended supervision and not parole. The court, the district attorney, and defense counsel all agreed that the judgment should be amended so that

744

Barbeau would be eligible for release to extended supervision in 2048. However, before the judgment was amended, Barbeau, with new counsel, moved for resentencing, arguing that the error in imposing a parole eligibility date rather than an extended supervision eligibility date was a new factor that warranted modifying his sentence so that he would be eligible for release to extended supervision after twenty, instead of thirty-five, years of imprisonment. In addition, Barbeau argued that the statutory scheme he was sentenced under violated the prohibitions against cruel and unusual punishment contained in the United States and Wisconsin Constitutions. The circuit court granted Barbeau's motion only to the extent of amending the judgment to reflect that he was eligible for extended supervision on November 24, 2048. We reject Barbeau's contentions that the error at sentencing is a new factor that justifies a modification of his sentence and that his sentence is cruel and unusual; thus, we affirm.

## BACKGROUND

### *The Crime*

¶ 2. On September 17, 2012, thirteen-year-olds Barbeau and Nathan A. Paape agreed to murder Barbeau's great-grandmother, Barbara Olson, because she "was somewhat rich and could be killed for money." Later that day, they went to Olson's house. Barbeau brought a hatchet; Paape brought a hammer. When Olson greeted them at the door and then turned her back, Barbeau struck Olson with the blunt end of the hatchet, knocking her to the floor. Barbeau struck Olson several more times with the blunt end of the hatchet, while Olson tried to cover her head and cried

for him to stop. Barbeau called for Paape's help, and Paape struck Olson twice in the head with the hammer. Using the sharp end of the hatchet, Barbeau struck Olson, lodging the blade in her head. In total, according to the medical examiner, Olson was struck twenty-seven times, eighteen of which were blows to the head. Realizing that Olson was now dead, Barbeau and Paape searched her house, taking jewelry, a purse, and money.

¶ 3. Barbeau and Paape talked for several hours, devising a plan to conceal their murder of Olson. They wanted to put Olson in the trunk of her car, but were unable to lift her and, instead, left her in the garage. They wiped down portions of the house, placed the wipes in bags, and put the bags, along with the hammer and hatchet, and proceeds from the house into Olson's car. Paape put a pillow on the driver's seat so that he could see above the steering wheel, and then drove the car with Barbeau in the passenger seat back to Sheboygan, parking near a church, a few blocks from Paape's home.

¶ 4. The following day Barbeau and Paape returned to the vehicle. They drove it to a bowling alley and then walked to a pizzeria where they ate pizza. They went to a supermarket and purchased gloves and cleaning wipes. Then they returned to the car, wiped down the interior for fingerprints and blood, and left the car keys in the front seat with the jewelry in sight in the hope that someone would steal the car and be blamed for the murder of Olson. Barbeau and Paape took Olson's purse, which contained $150. The police later found Olson's purse containing her identification in a sewer a few houses away from Paape's home. The

police also located Olson's car, finding the hammer and hatchet inside, jewelry, and a school paper containing the name "Nate."

*Charge and Plea*

¶ 5. Barbeau was charged as a party to the crime of first-degree intentional homicide under Wis. Stat. § 940.01(1)(a) (2013–14),[1] a Class A felony. For a Class A felony, the penalty is life imprisonment. Wis. Stat. § 939.50(3)(a). Ultimately, Barbeau pled no contest to the charge. At the plea hearing, defense counsel recited that it was his understanding that upon the circuit court's acceptance of Barbeau's plea, "the [S]tate has agreed to recommend a parole eligibility date of 35 years." The district attorney agreed that this was "a correct recitation of the plea agreement." The circuit court advised Barbeau that "there would have to be some determination of a parole date." Defense counsel had advised Barbeau of the same, counsel told the court. The plea questionnaire Barbeau signed advised him that he faced a mandatory minimum of twenty years before being eligible for parole, with a maximum of life in prison.

¶ 6. At sentencing, on August 12, 2013, comments from the district attorney, defense counsel, and Barbeau's mother, all show that they were under the mistaken impression that the circuit court was going to impose a parole supervision eligibility date.

¶ 7. Before imposing sentence, the court commented that "if we would be looking at this with an adult, this is the type of case that would be called for life without any chance of parole." This, however, was

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

not an available alternative because Barbeau was a juvenile, and the United States Supreme Court precedent prohibited a sentence of life without the possibility of parole for a juvenile.[2] The State's recommendation, the court said, was "the absolute minimum necessary to ensure the protection of the public." In fact, the court "had in mind a later eligibility date" than what it was going to order. The circuit court judge stressed the gravity of the offense. He variously described this offense as unlike anything he had seen in his twenty-four years on the bench, "not anything close"; that this was "nothing short of horrific," "the most severe of the types of crimes that can happen," an "extremely cruel act," and "indescribable." The court ordered Barbeau eligible for parole on November 24, 2048.

¶ 8. The court then proceeded to warn Barbeau in accordance with WIS. STAT. § 973.014(1g)(b) that the DOC may extend the date when he would become eligible for extended supervision if he committed infractions while incarcerated or was placed in an adjustment program or controlled segregation status.

*Postconviction*

¶ 9. Two days after judgment was entered, the DOC wrote to the circuit court requesting clarification, pointing out that since Barbeau had been convicted of first-degree intentional homicide, under WIS. STAT. § 973.014(1g)(a), "he would need to be eligible for extended supervision, not parole."

¶ 10. In light of the DOC's letter, the State moved for a hearing to correct the sentence.

---

[2] As discussed *infra,* the circuit court's statement was erroneous.

¶ 11. Defense counsel wrote the court, declining to object over amending the judgment to read "extended supervision" instead of parole. In light of counsel's letter, the court proposed amending the judgment without a hearing, to which defense counsel agreed in writing. The court, however, neglected to amend the judgment.

*Barbeau's Motion for Postconviction Relief*

¶ 12. More than a year after being sentenced and now represented by different counsel, Barbeau moved for resentencing, arguing that the judgment should be modified to reflect his eligibility for extended supervision, and not parole, and after twenty years of confinement. He argued that the present sentence was invalid because a parole supervision eligibility date was imposed rather than an extended supervision eligibility date; that the differences between the two were new factors that warranted amending the sentence to reflect an extended supervision eligibility date of twenty, instead of thirty-five, years from the offense; and that counsel was ineffective for not knowing the current law. In addition, Wisconsin's statutory scheme for sentencing Class A felonies as applied to a juvenile was unconstitutional.

¶ 13. After a hearing, the circuit court granted Barbeau's motion in part, amending the judgment to reflect he was eligible for extended supervision on November 24, 2048. The court, however, refused to modify Barbeau's sentence.[3] It also concluded that Wisconsin's statutory scheme for sentencing minors convicted of Class A felonies was not unconstitutional.

---

[3] The court did not directly address this issue, but its denial was implicit.

## ANALYSIS

*The Circuit Court did not Err in Determining that
the Alleged New Factor—Setting Eligibility for
Extended Supervision Rather than Parole—did not
Warrant Modification of Barbeau's Sentence*

¶ 14. Barbeau contends that the ignorance of his
counsel, the district attorney, and the court that he
would be eligible for release on extended supervision
and not parole is a new factor. This is because of the
"significant differences" between release on parole and
release on extended supervision. Release on parole
requires the parole commission to consider a host of
factors, and various parties must be notified and may
give their input, which allows the parole commission to
develop a comprehensive assessment of the offender
when deciding whether release to parole is appropri-
ate. Release on extended supervision, in contrast, is in
the hands of the circuit court, and the only consider-
ation is the risk the offender poses to the public. With
these differences in mind, defense counsel would have
had to do more at the sentencing hearing. Specifically,
Barbeau argues, defense counsel should have secured
an alternative presentence investigation addressing
all the factors the parole commission would have
considered under the old law, present a full assessment
of his client's rehabilitative needs, the time needed to
address those needs, and the diminished culpability of
youthful offenders. In the absence of this information,
the circuit court will have little to consider when
deciding whether to approve extended supervision
release when that time comes.

*New Factor Analysis*

¶ 15. A court may base a modification of sentence upon a defendant's showing of a "new factor." *State v. Harbor*, 2011 WI 28, ¶ 35, 333 Wis. 2d 53, 797 N.W.2d 828. Such a motion requires a defendant to make a two-part showing: the existence of a new factor and that the new factor justifies modification of the sentence. *Id.*, ¶¶ 36–37. A new factor is defined as a set of facts highly relevant to the imposition of a sentence but not known to the trial judge at the time of the original sentencing, either because it was not then in existence or because it was unknowingly overlooked by all the parties. *Id.*, ¶ 40. A defendant bears the burden on both these inquiries by clear and convincing evidence. *State v. Crockett*, 2001 WI App 235, ¶ 13, 248 Wis. 2d 120, 635 N.W.2d 673. Whether a new factor exists is a question of law, which is reviewed de novo, while whether the new factor justifies a modification of sentence involves the exercise of discretion, which is reviewed for an erroneous exercise of discretion. *Harbor*, 333 Wis. 2d 53, ¶ 33; *State v. Sobonya*, 2015 WI App 86, ¶ 4, 365 Wis. 2d 559, 872 N.W.2d 134.

*Eligibility for Extended Supervision*
*Replaced Eligibility for Parole*

¶ 16. In 1998, the legislature passed the first phase of Wisconsin's Truth in Sentencing legislation. 1997 Wis. Act 283. In doing so, Wisconsin abolished the parole system. *See State v. Stenklyft*, 2005 WI 71, ¶ 54, 281 Wis. 2d 484, 697 N.W.2d 769. Hence, in order to bring a sentence of life imprisonment in line with the Truth in Sentencing legislation, WIS. STAT.

§ 973.014(1g) had to be added so that an offender who was sentenced to life imprisonment for committing a Class A felony on or after December 31, 1999, would, if declared eligible by the sentencing court, be released to extended supervision.

¶ 17. Barbeau fails to show by clear and convincing evidence that, under the old and new scheme, the circuit court's determination of when he would be eligible for release to either parole or extended supervision is different. Under WIS. STAT. § 973.014(1), when an offender was sentenced to life imprisonment for a crime committed on or after July 1, 1988, but before December 31, 1999, the court was to "make a parole eligibility determination" and choose among three options: that the offender is eligible for parole after having served twenty years in prison, eligible on a date after twenty years, or not eligible for parole.[4] Under its replacement, § 973.014(1g)(a), when an offender is sentenced to life imprisonment for a crime committed on or after December 31, 1999, "the court shall make an extended supervision eligibility date determination" and choose among three options: that the offender is eligible for extended supervision after having served twenty years in prison, eligible on a date after twenty years, or not eligible for release. Thus, the circuit court had the same three options for eligibility for supervised release from prison.

██

¶ 18. Moreover, when an offender should first be eligible to seek release on extended supervision is governed by the same factors that govern a sentencing decision: "the gravity of the offense, the character of

---

[4] The latter "applies only if the court sentences a person for a crime committed on or after August 31, 1995, but before December 31, 1999." WIS. STAT. § 973.014(1)(c).

the offender, and the need for protection of the public."
*See State v. Young,* 2009 WI App 22, ¶¶ 22, 24–25, 316
Wis. 2d 114, 762 N.W.2d 736 (citation omitted). These
same factors have been used to guide a court's decision
on when an offender should be eligible to seek release
on parole. *See State v. Seeley,* 212 Wis. 2d 75, 87, 567
N.W.2d 897 (Ct. App. 1997).

¶ 19. Thus, Barbeau has failed to show by clear
and convincing evidence that, whether the court con-
siders an eligibility date for release on extended super-
vision or parole, the determination is not functionally
and substantively the same. *See State v. Brown,* 2006
WI 131, ¶ 6, 298 Wis. 2d 37, 725 N.W.2d 262 ("Under
Truth in Sentencing, extended supervision and recon-
finement are, in effect, substitutes for the parole sys-
tem that existed under prior law.").

¶ 20. Finally, while Barbeau points to the differ-
ences for deciding release to parole and extended
supervision *when the time comes,* he fails to identify
how those differences impacted the circuit court's
eligibility determination. Namely, in terms of provid-
ing information to the circuit court, including such
things as the offender's youth, rehabilitative need
and potential, etc., Barbeau fails to tell us what
information was or was not provided to the circuit
court here, how it would differ when addressing
eligibility for parole as compared to extended super-
vised release, and most importantly, how it would
result in a twenty, as compared to a thirty-five, year
eligibility date.[5]

---

[5] Barbeau's argument is puzzling because his position
seems to be that the erroneous application of the law led
counsel not to present information relevant to whether Bar-
beau should be *released* on extended supervision, in contrast
to when he should be *eligible* for release. In other words,

¶ 21. The circuit court amended the judgment of conviction to properly reflect Barbeau's eligibility for extended supervision rather than parole. Barbeau has failed to establish by clear and convincing evidence that the prior mistake was highly relevant to the sentencing decision to make Barbeau eligible for release on extended supervision after thirty-five years of imprisonment. The circuit court did not erroneously exercise its discretion in declining to modify Barbeau's sentence, as Barbeau failed to establish any impact on the court's eligibility decision. *See Harbor*, 333 Wis. 2d 53, ¶ 62–65.

■

¶ 22. Relatedly, Barbeau argues that his trial counsel's ignorance of the correct law resulted in Barbeau being denied his right to constitutionally effective assistance of counsel. Barbeau, however, waived his claim of ineffective assistance of counsel by failing to request a *Machner*[6] hearing where trial counsel could testify. *See State v. Curtis,* 218 Wis. 2d 550, 554, 582 N.W.2d 409 (Ct. App. 1998). In any event,

Barbeau appears to argue that counsel, *at the time of sentencing,* should present information as to whether Barbeau should be released on extended supervision when he first becomes eligible for release. When an offender should first be eligible for release and whether that offender should actually be released are substantively different inquiries and, as in this case, separated by a wide span of time. While Barbeau contends that if information related to extended supervision release "is not presented at the time of sentencing, it may well not be considered later on," he provides no support for his contention.

[6] *State v. Machner,* 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

Barbeau has failed to show how counsel's error prejudiced his client. *See Strickland v. Washington,* 466 U.S. 668, 691–92 (1984).

## *Constitutionality*

¶ 23. Barbeau argues that for a juvenile convicted of first-degree intentional homicide the statutory scheme for sentencing and release to extended supervision violates the prohibitions contained in the United States and Wisconsin Constitutions against cruel and unusual punishment. His argument is threefold: First, that Wis. Stat. § 973.014(1g)(a)3. is unconstitutional because it imposes a life sentence and one option does not allow for extended supervision at all. Second, that the mandatory minimum of twenty years' imprisonment provided by § 973.014(1g)(a)1. is "categorically unconstitutional" when it is "applied to children." This conclusion, Barbeau argues, follows as a natural extension flowing from a trilogy of cases decided by the United States Supreme Court and is the same one the Iowa Supreme Court reached with respect to all mandatory minimum sentences when applied to juveniles, which Barbeau urges us to adopt. Third and finally, he argues that the statutory scheme for release on extended supervision "does not afford a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." This is because in deciding whether an offender should be released on extended supervision, a court may consider only whether the offender is a danger to the public. In addition, an offender is not guaranteed the right to a hearing or a right to counsel. We take each of these contentions in turn.

## Constitutional Analysis

### Barbeau Has Not Shown that a Sentence of Life Imprisonment Without the Possibility of Obtaining Supervised Release for a Juvenile Convicted of First-Degree Intentional Homicide is Unconstitutional

¶ 24. First, Barbeau has no standing to categorically challenge WIS. STAT. § 973.014(1g)(a)3. on the ground that it permits a sentencing court to impose life imprisonment with no extended supervision. As we have already discussed, in sentencing an offender to life imprisonment, § 973.014(1g)(a) gives the circuit court three options: eligibility for release to extended supervision after twenty years, after some time later than twenty years, or not eligible for release to extended supervision. *See Young*, 316 Wis. 2d 114, ¶ 25 n.9; *see also State v. Ninham*, 2011 WI 33, ¶ 42 n.10, 333 Wis. 2d 335, 797 N.W.2d 451. In sentencing Barbeau, the circuit court chose the second option. Since Barbeau was not found ineligible for release to extended supervision, he was not injured by § 973.014(1g)(a)3. and, thus, has no standing to challenge it. *See State v. Iglesias*, 185 Wis. 2d 117, 132, 517 N.W.2d 175 (1994) ("A party has standing to challenge a statute if that statute causes that party injury in fact and the party has a personal stake in the outcome of the action." (citation omitted)).

¶ 25. Nevertheless, we exercise our option to address Barbeau's challenge on the merits because our supreme court rejected a similar, but slightly different, categorical challenge to the application of the sentencing scheme for first-degree intentional homicide to

756

juvenile offenders in *Ninham*. The United States Supreme Court's recent decision in *Miller v. Alabama*, 132 S. Ct. 2455, 2463–64 (2012), does not alter the analysis of *Ninham*.

*Our Supreme Court's Holding in Ninham*

¶ 26. In *Ninham*, the fourteen-year-old defendant was convicted of first-degree intentional homicide of a thirteen-year-old boy. *Ninham*, 333 Wis. 2d 335, ¶ 2. In a motion for sentencing relief under WIS. STAT. § 974.06, he challenged his sentence of life imprisonment without the possibility of parole as cruel and unusual in violation of the United States and Wisconsin Constitutions. *Ninham*, 333 Wis. 2d 335, ¶ 43. In that case, as in this case, the sentencing court had the option of denying supervised release. *Id.*, ¶ 42. In that case, unlike here, the sentencing court chose that option.

¶ 27. The *Ninham* court began by noting that both the Eighth Amendment to the United States Constitution and article I, section 6 of the Wisconsin Constitution prohibit the infliction of cruel and unusual punishments. *See Ninham*, 333 Wis. 2d 335, ¶ 45. Generally, our supreme court has interpreted the provision in our state constitution consistently with the Eighth Amendment. *Ninham*, 333 Wis. 2d 335, ¶ 45. Consequently, "our analysis . . . is largely guided by the Supreme Court's Eighth Amendment jurisprudence and in particular, the cases concerning juvenile offenders." *Ninham*, 333 Wis. 2d 335, ¶ 45.

¶ 28. The basic precept underlying the prohibition against cruel and unusual punishment is one of proportionality—that punishment for the crime should

be graduated and proportional to both the offender and the offense. *Id.*, ¶ 46. A punishment violates this prohibition if it is "inconsistent with 'evolving standards of decency that mark the progress of a maturing society.' " *Id.* (citation omitted). In deciding a categorical challenge such as this, a court will first consider "objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue." *Id.*, ¶ 50 (citation omitted). Second, notwithstanding such objective evidence, a court will exercise "its own independent judgment" to determine whether the punishment violates the constitutional prohibition. *Id.*

¶ 29. Whether a statutory scheme is unconstitutional is a question of law subject to de novo review. *Id.*, ¶ 44. Every legislative enactment is presumed to be constitutional. *Id.* Every presumption to sustain the law if at all possible will be indulged, and if any doubt exists about the constitutionality of a statute, that doubt will be resolved in favor of constitutionality. *Id.* In other words, the party challenging the statute bears the burden of demonstrating "that the statute is unconstitutional beyond a reasonable doubt." *Id.*

¶ 30. After an extensive discussion of the United States Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551, 569–72 (2005), and *Graham v. Florida*, 560 U.S. 48, 68–74 (2010), as well as the above two-step analysis applicable to a categorical proportionality challenge, our supreme court held "that sentencing a 14–year-old to life imprisonment without the possibility of parole for committing [first

758

degree] intentional homicide is not categorically unconstitutional." *Ninham*, 333 Wis. 2d 335, ¶¶ 52–53, 61–70, 83. In doing so, our supreme court noted that *Roper*, which barred the death penalty for juveniles, dealt with the "the most severe penalty recognized by law." *Ninham*, 333 Wis. 2d 335, ¶ 75. Thus, *Roper*

> does not . . . stand for the proposition that the diminished culpability of juvenile offenders renders them categorically less deserving of the second most severe penalty, life imprisonment without parole. Indeed, the *Roper* Court affirmed the Missouri Supreme Court's decision to modify the 17–year-old defendant's death sentence to life imprisonment without eligibility for parole.

*Ninham*, 333 Wis. 2d 335, ¶ 75 (citation omitted). Similarly, *Graham* dealt with life imprisonment without the possibility of parole for a juvenile convicted of a nonhomicide and, thus, "does not . . . support the argument that juvenile offenders who commit homicide are categorically less deserving of life imprisonment without parole." *Ninham*, 333 Wis. 2d 335, ¶ 76. Therefore, neither case precluded a court "from concluding that a juvenile who commits homicide is sufficiently culpable to deserve life imprisonment without the possibility of parole." *Id.*, ¶ 77.

¶ 31. In *Miller*, the United States Supreme Court, building on *Roper* and *Graham*, held that a statute that mandates a sentence of life imprisonment without the possibility of parole for a juvenile convicted of capital murder violates the prohibition against cruel and unusual punishment. *Miller*, 132 S. Ct. at 2460. This is because such a statute precludes a

759

judge from considering a juvenile's lessened culpability due to age. *Id.* at 2460, 2467. Precluding a judge from considering the characteristics of youth, and the way they weaken the rationale for punishment, can render a sentence of life without parole for intentional homicide disproportionate as to a juvenile.

¶ 32. Although *Miller* was decided after *Ninham*, nothing in *Miller* undercuts our supreme court's holding in *Ninham*. Indeed, in *Miller*, the United States Supreme Court did "not consider [the] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." *Miller*, 132 S. Ct. at 2469. The court did not "foreclose a sentencer's ability to [sentence a juvenile to life without the possibility of parole] in homicide cases," but required sentencing courts "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* Thus, it is not unconstitutional to sentence a juvenile to life imprisonment without the possibility of supervised release for intentional homicide if the circumstances warrant it.

¶ 33. In sum, what the United States Supreme Court in *Miller* found unconstitutional was a statutory scheme that mandates a punishment of life imprisonment without the possibility of parole for a juvenile convicted of intentional homicide. WISCONSIN STAT. § 973.014(1g)(a) does not mandate life imprisonment without the possibility of release to extended supervision, but gives the circuit court the discretion to impose such a sentence if the circumstances warrant it.

*Barbeau Has Not Shown that it is Unconstitutional
to Mandate a Minimum of Twenty Years'
Imprisonment for a Juvenile Who Commits
First-Degree Intentional Homicide*

¶ 34. Second, Barbeau also lacks standing to challenge the twenty-year mandatory minimum in WIS. STAT. § 973.014(1g)(a)1. As the State persuasively argues, because Barbeau received far in excess of twenty years' imprisonment, the statutory mandatory minimum sentence "did not play any role in Barbeau's sentence." In other words, Barbeau was not "adversely affected" by the statutory minimum. *Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n*, 2011 WI 36, ¶ 40, 333 Wis. 2d 402, 797 N.W.2d 789 (stating that one aspect of standing asks "whether the interest of the party whose standing is challenged will be injured, that is, adversely affected"); *Iglesias*, 185 Wis. 2d at 132 (to give standing, statute must have caused injury in fact to party and that party must have a personal stake in the outcome of the action); *see United States v. Gray*, 577 F.3d 947, 950–51 (8th Cir. 2009) (where defendant received ten months more imprisonment than statutorily required, he had no standing to challenge the constitutionality of the statute); *see also State v. Duffy*, 6 P.3d 453, 464 (Mont. 2000) (where defendant received more than mandatory minimum, he had no standing to raise any constitutional challenges to the mandatory minimum).

¶ 35. As an alternative holding, the mandatory minimum set forth in WIS. STAT. § 973.014(1g)(a)1. does not violate the prohibitions against cruel and

unusual punishment contained in the United States and Wisconsin Constitutions.

¶ 36. As noted above, in deciding a categorical challenge such as this, a court will first consider "objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue." *Ninham*, 333 Wis. 2d 335, ¶ 50 (citation omitted). Second, notwithstanding such objective evidence, a court will exercise "its own independent judgment" to determine whether the punishment violates the constitutional prohibition. *Id.*

¶ 37. Barbeau has failed to carry his burden of showing the statutory scheme is unconstitutional beyond a reasonable doubt. The only objective evidence Barbeau provides us are citations to the "only . . . handful of Wisconsin felonies" that "are subject to mandatory minimum prison time," such as criminal operating a motor vehicle under the influence, *see* WIS. STAT. § 346.65, or child sex offenses, *see* WIS. STAT. § 939.616, pointing out that a person convicted of the latter who was under eighteen years of age at the time of the violation is not subject to the mandatory minimum. These comparisons, however, are inapt. The intentional taking of another life is unique. The harm of a nonhomicide, which can be devastating as in the case of a sex offense against a child, "cannot be compared to murder" in its "severity and irrevocability." *Graham*, 560 U.S. at 69 (citation omitted). Thus, "[t]here is a line between homicide and other serious violent offenses against the individual." *Id.* (citation omitted).

¶ 38. Barbeau has not shown any indication that there is any kind of consensus against a mandatory minimum sentence of twenty years' imprisonment for a juvenile who commits first-degree intentional homicide. While the supreme court's decision in *Ninham* did not address the mandatory minimum, its extensive analysis of a sentence of life without the possibility of parole for a juvenile convicted of first-degree intentional homicide is equally applicable here. *Ninham*, 333 Wis. 2d 335, ¶¶ 51–58. The court concluded there was no national consensus against such a sentence. *Id.*, ¶ 58. Barbeau provides nothing to suggest the analysis has changed.

¶ 39. Moreover, the state of the law as to mandatory minimums in general is to the contrary. *See State v. Lyle*, 854 N.W.2d 378, 387 (Iowa 2014) ("[The] state of the law arguably projects a consensus in society *in favor* of permitting juveniles to be given mandatory minimum statutory sentences." (emphasis added)); *see also People v. Banks*, 36 N.E.3d 432, 506 (Ill. App. Ct. 2015) (mandatory minimum sentence for first-degree murder did not violate juvenile defendant's constitutional rights to be free from cruel and unusual punishment); *State v. Vang*, 847 N.W.2d 248, 262–63 (Minn. 2014) (mandatory minimum sentence of life imprisonment with possibility of release after thirty years for first-degree felony murder for juvenile did not violate Eighth Amendment); *Commonweath v. Lawrence*, 99 A.3d 116, 121–22 (Pa. Super. Ct. 2014) (statute imposing a mandatory minimum of thirty-five years on a juvenile defendant convicted of first-degree murder did not violate Eighth Amendment).

¶ 40. The exercise of our independent judgment does not lead to a contrary conclusion. Barbeau urges

us to be "guided" by "the same principles" as the United States Supreme Court in *Miller* and the Iowa Supreme Court in *Lyle*.[7]

¶ 41. As discussed above, the principle that emerges from *Miller* is that for a juvenile convicted of murder, the Eighth Amendment requires that before a sentence of life imprisonment without the possibility of parole may be imposed, a sentence "akin to the death penalty," a judge must be able to make an "individualized" sentencing determination, allowing for the consideration of the juvenile's age. *Miller*, 132 S. Ct. at 2460, 2466–67. But, this principle is not at stake here. Barbeau was not sentenced to life in prison without the possibility of parole, and the circuit court's discretion was not totally circumscribed. The circuit court had the discretion to mete out a punishment, taking into account Barbeau's youth, in deciding when, if ever, he should be eligible for supervised release.[8] The circuit

___

[7] Because *State v. Ninham*, 2011 WI 33, ¶¶ 45–46, 333 Wis. 2d 335, 797 N.W.2d 451, and *Miller v. Alabama*, 132 S. Ct. 2455, 2463 (2012), incorporate the proportionate punishment analysis of *Graham v. Florida,* 560 U.S. 48, 75 (2010) (Eighth Amendment prohibits sentencing a juvenile to life imprisonment without the possibility of parole for a nonhomicide offense), and *Roper v. Simmons,* 543 U.S. 551, 578 (2005) (Eighth Amendment prohibits sentencing a juvenile to death), we need not discuss them separately.

[8] The court considered both aggravating and mitigating circumstances. The court specifically considered "the character of the defendant," including his age, recognizing that "young people cannot always be held responsible for their actions." At the same time, though, the court noted that this was not a taking of property, which a juvenile might think "is no big deal," but the unjustified taking of a life, an act "that in all societies over time has been looked upon as something

court's discretion was not unlimited—it could not sentence Barbeau to a single day in prison or even fifteen years—but that limitation—that at least a sentence of twenty years' imprisonment is warranted in any case where a first-degree intentional homicide is concerned—is much different than the limitation contained in the statutes in Miller, which gave those courts no discretion at all. *See State v. Taylor G.,* 110 A.3d 338, 346 (Conn. 2015) (" [M]andatory minimum requirements, while limiting the trial court's discretion to some degree, still left the court with broad discretion to fashion an appropriate sentence that accounted for the defendant's youth and immaturity when he committed the crimes.").

¶ 42. Again, while the mandatory minimum was not discussed, the supreme court's analysis in *Ninham*, including the analysis of differences between juveniles and adults set forth in *Roper* and *Graham* (and further discussed in *Miller*), is equally applicable here. The court, applying its independent judgment, considered the culpability of a juvenile offender convicted of first-degree intentional homicide, as well as the penological goals in sentencing, and concluded that life imprisonment without the possibility of parole was not categorically unconstitutional. *Ninham,* 333

that is just absolutely wrong . . . something that is inculcated into children at an early age." At the postconviction hearing, the court noted that the hatchet and hammer were brought to the scene and, as compared to a firearm shot taken from a distance, the victim was repeatedly hit in the head while pleading for her life. The court emphasized that "there was just a complete and utter lack of empathy and a matter of going through these actions which were just horrendous." Barbeau does not argue that the circuit court erroneously exercised its discretion.

Wis. 2d 335, ¶¶ 50–83. Again, nothing about the mandatory minimum detracts from this analysis.

¶ 43. In addition to considerations of the offender's culpability, the legislature's requirement that there be a sentence of at least twenty years' imprisonment for the intentional taking of another human life reflects a societal judgment that this is the very least required, even where the offender is a juvenile, in order to meet legitimate penological goals such as retribution—an expression of society's moral outrage at particularly offensive conduct—deterrence—to deter other potential juvenile homicide offenders—and incapacitation—so that offender himself will not harm anyone else. *See id.*, ¶¶ 80–82; *see also Harmelin v. Michigan*, 501 U.S 957, 999–1000 (1991) (Kennedy, J., concurring) (the fixing of prison terms for specific crimes involves a substantial penological judgment that, as a general matter, is properly within the province of the legislature, reviewing courts should grant substantial deference to legislative determinations, there are a variety of legitimate penological schemes based on theories of retribution, deterrence, incapacitation, and rehabilitation, and the Eighth Amendment does not mandate adoption of any one such scheme). "We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved." *Ninham*, 333 Wis. 2d 335, ¶ 44 (citation omitted). We see nothing disproportionate on a constitutional level in this scheme.

¶ 44. As for *Lyle*, in addition to being nonprecedential for our purposes, *see State v. Muckerheide*, 2007 WI 5, ¶ 7, 298 Wis. 2d 553, 725 N.W.2d 930, it

was decided under the Iowa Constitution and not the United States Constitution. *Lyle*, 854 N.W.2d at 380 ("[W]e hold a statute mandating a sentence of incarceration in a prison for juvenile offenders with no opportunity for parole until a minimum period of time has been served is unconstitutional under . . . the Iowa Constitution."). Since our supreme court has generally interpreted the cruel and unusual punishment provision in the Wisconsin Constitution consistently with its counterpart in the United States Constitution, and particularly in light of the supreme court's analysis in *Ninham*, we have no basis to depart from that interpretation, as the Iowa Supreme Court did.

*Barbeau Has Not Shown that Wisconsin Law*
*Deprives a Juvenile of a Meaningful Opportunity*
*to Obtain Release Based on Demonstrated*
*Maturity and Rehabilitation*

¶ 45. Third and finally, Barbeau has failed to show that the current statutory scheme denies him a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

¶ 46. In *Graham*, the United States Supreme Court held that it violated the Eighth Amendment to impose a life sentence in prison without the possibility of parole for a juvenile convicted of a nonhomicide offense. *Graham*, 560 U.S. at 74–75. Where a juvenile has been convicted of a nonhomicide crime, "[a] State is not required to guarantee eventual freedom," but it must give such an offender "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. The United States

Supreme Court did not develop this concept further, leaving it to the states, "in the first instance, to explore the means and mechanisms for compliance." *Id.*

■■■

¶ 47. WISCONSIN STAT. § 302.114(5)(cm) provides that a court may not grant a petition for release to extended supervision, "unless the inmate proves, by clear and convincing evidence, that he or she is not a danger to the public." Whether an inmate is no longer a danger to the public is obviously informed by whether that inmate has matured and been rehabilitated. In other words, contrary to Barbeau's contention, there is more than "only one criterion for the release determination;" that criterion subsumes other inquiries. A lack of maturity and underdeveloped sense of responsibility in juveniles often leads to impetuous and ill-considered actions. *See Miller*, 132 S. Ct. at 2464. Juveniles make rash decisions without reflecting on the harm their actions may have to others and to themselves. Over time, however, it is possible that these "deficiencies will be reformed," *id.* at 2465, that the offender will mature, develop a greater sense of responsibility, and a greater capacity for reflection on the consequences of an action before taking it. *See Roper*, 543 U.S. at 570 ("[A] greater possibility exists that a minor's character deficiencies will be reformed."); *Johnson v. Texas*, 509 U.S. 350, 368 (1993) ("[T]he signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.").

¶ 48. In short, once eligible for release to extended supervision, here in 2048, Barbeau will likely seek to prove that he is no longer a danger to the public by showing that his criminal conduct was influenced

by his youth. In the same way, Barbeau will seek to prove that he is no longer a danger to the public by showing that he has been rehabilitated. Barbeau has failed to show beyond a reasonable doubt that the criteria for release deprive him of a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

¶ 49. Finally, Barbeau's claims that Wisconsin law deprives him of a meaningful opportunity to obtain release to extended supervision because Wisconsin law does not guarantee a hearing or counsel were not adequately developed below. These claims were raised in a single sentence without citation to any authority to support them. As such, these claims are not preserved for our review. *See Schonscheck v. Paccar, Inc.*, 2003 WI App 79, ¶¶ 9–11, 261 Wis. 2d 769, 661 N.W.2d 476.

## CONCLUSION

¶ 50. The error of the court and counsel in thinking that Barbeau would be eligible to petition for release to parole supervision as opposed to extended supervision does not warrant a modification of Barbeau's sentence because Barbeau has failed to show by clear and convincing evidence that the eligibility determination was not functionally and substantively the same. He has failed to show that the error was highly relevant to the sentencing decision or that the court erroneously exercised its discretion in declining to set an earlier date for eligibility for extended supervision. To the extent Barbeau has standing to raise any of his constitutional claims, they lack merit. Barbeau did not receive a sentence of life imprisonment without

the possibility of supervised release. In any event, the imposition of such a sentence on a juvenile is not constitutionally impermissible provided it leaves room for the exercise of the court's discretion to impose something less in light of the juvenile's age. Barbeau did not receive the mandatory minimum of twenty years' imprisonment but, even if he had, such is not constitutionally disproportionate to Barbeau's crime of first-degree intentional homicide, even for a juvenile. Finally, while Barbeau will not be eligible to seek release until 2048, he has failed to show that the consideration of whether he is not a danger to the public deprives him of a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. Thus, we affirm.

*By the Court.*—Judgment and order affirmed.