BRASH, J.
¶1 Jevon Dion Jackson appeals the trial court's denial of his postconviction motion seeking resentencing. Jackson was a juvenile when he committed the crimes for which he seeks resentencing, which include first-degree intentional homicide. He argues that his sentence-life imprisonment with eligibility for parole when he is 101 years old-violates the Eighth Amendment of the United States Constitution as well as article I, section 6 of the Wisconsin Constitution, citing recent decisions of the United States Supreme Court regarding life sentences for juveniles.
¶2 The trial court rejected Jackson's argument. It agreed with the State that there are Wisconsin cases that have previously addressed this issue and are binding on the court.[1] We agree and affirm.
BACKGROUND
¶3 This case stems from the November 1993 murder of a woman in the parking lot of a fast food restaurant at 29th Street and Capitol Drive in Milwaukee. The victim was shot in the head at point-blank range, execution style, after being ordered to get down on her knees. This occurred in front of the victim's then-ten-year-old daughter.
¶4 Jackson, who was sixteen years old at the time, confessed to the crime. Jackson stated that on the day of the murder, he and his friend, L.C., had obtained a sawed-off shotgun from L.C.'s house and were planning to commit robberies. Jackson explained that he and L.C. had determined that they should target white people because they believed white people were less likely to be armed.
¶5 Jackson stated that he and L.C. walked to the fast food restaurant and observed the victim enter the restaurant with her daughter. Jackson and L.C. waited outside for about ten minutes until the victim and her daughter came out. Jackson and L.C. then approached them and Jackson pulled the loaded shotgun out from under his clothing where it had been concealed. They ordered the victim and her daughter to give them their food, which the daughter was carrying. Jackson then ordered the victim to get down on her knees and to give him her money. The victim replied that she did not have any money and looked back at Jackson out of the corner of her eye.
¶6 Jackson explained that he believed the victim "had a[n] attitude" and was not taking him seriously. He cocked the weapon to scare her, and heard L.C. say "[d]on't do it man." Jackson claimed that he had forgotten that the shotgun was loaded; however, he also said he "didn't care" whether the weapon was loaded or not because the victim had made him very angry with her "attitude." He then pulled the trigger and shot her in the head. Jackson and L.C. ran away, dumping the food and the shotgun in garbage cans in a nearby alley.
¶7 The victim's daughter ran into the restaurant for help. The responding detective from the Milwaukee Police Department found the victim lying in a pool of blood in the parking lot, and observed pieces of bone, scalp, and brain matter scattered over an approximate eighty-foot radius surrounding the victim.
¶8 Jackson was arrested and charged with first-degree intentional homicide, armed robbery, attempted armed robbery, and possession of a short-barreled shotgun, all as a party to a crime. He was waived into criminal court and the matter proceeded to trial in July 1995. He was convicted of all four charges.
¶9 A presentence investigation report (PSI) was prepared. Jackson had no previous record, as either a juvenile or an adult. However, there was a matter pending in Milwaukee County Children's Court at the time of this crime; Jackson had been arrested for a battery that occurred at Oak Creek High School in September 1993. Jackson claimed that the victim had bumped into him in an intimidating way. Jackson then punched the victim in the head, and after the victim fell and struck his head on a shelf, Jackson continued to hit and kick the victim while the victim was on the floor. A witness to the battery stated that Jackson had approached the victim from behind and punched him with no provocation.
¶10 Jackson was also involved in a "confrontation" with another inmate two days before his trial. Jackson thought the other inmate was going to hit him, so he punched the inmate in the jaw. Jackson stated that as a disciplinary measure he was given twenty days "in the hole" and believed that the other inmate had not been disciplined.
¶11 The PSI also described Jackson's family background. Jackson could not recall ever meeting his father, but said that he had a good relationship with his mother. Jackson had to live with relatives for a time while his mother was incarcerated at the House of Corrections for welfare fraud. She was also taken into custody while on probation for threatening her then-boyfriend with a knife. Additionally, Jackson was referred to the Department of Social Services in June 1992 out of concern that he was suicidal.
¶12 Jackson reported that conflicts with his mother began when he turned sixteen years old, and that he had run away from home two different times. He described being disciplined with whippings, but denied that he was abused. He stated that at the time of this crime he had worked things out with his mother, but was living with relatives. Overall, he felt that "his life was actually very good compared to other individuals."
¶13 The PSI further noted that Jackson was a student at Oak Creek High School at the time of the crime, had an average I.Q., and planned to go to college. He had also held several summer jobs through the Step Up Program. He was evaluated while in detention after this crime and was reported to have no indications of psychopathology, although his "psychological functionings appeared to be inordinately complex." It was further noted by the psychologist that when under stress, Jackson would experience "emotional confusion with both positive and negative feelings" and would generally try to respond in a "passive and non[ ]aggressive manner." The agent who prepared the PSI, however, concluded that the remorse expressed by Jackson over this crime "lacked sincerity and depth."
¶14 Jackson was sentenced in August 1995. At the sentencing hearing, the trial court noted the sentencing factors that it was required to consider. It specifically discussed the gravity of the crime, stating that it was a "[c]rime of unbelievable horror and depravity" in the way that Jackson had forced the victim to her knees and "basically blew her head apart" in front of her child.
¶15 The trial court also considered Jackson's "character, personality, and social traits." It referenced information from the PSI, noting Jackson's family and educational background, as well as the altercations Jackson had been involved in. The court also acknowledged that the agent who conducted the PSI believed that any remorse shown by Jackson was "superficial."
¶16 The trial court noted Jackson's age at the time of the crime, stating that it would take Jackson's "youthfulness" into consideration. The court further opined that Jackson's rehabilitative needs were "very limited," but that the needs of the community-protection and punishment for this crime-were very strong.
¶17 The sentence imposed on Jackson by the trial court for the first-degree intentional homicide charge was life imprisonment, with eligibility for parole in 2070. Furthermore, for the other charges Jackson was convicted of, the court ordered sentences totaling an additional thirty-two years, to be served consecutively. The court fashioned the sentences so that Jackson would not be eligible for parole until he was 101 years old.
¶18 Subsequent to his sentencing, Jackson filed two postconviction motions, one in 1996 and the other in 1998. Neither motion addressed sentencing issues. Both were rejected by the trial court and this court.
¶19 Jackson filed the postconviction motion that is the subject of this appeal in January 2017, seeking resentencing. Jackson, who is represented by counsel from the Frank J. Remington Center at the University of Wisconsin Law School, based his arguments on two recent United States Supreme Court decisions. The first case, Miller v. Alabama , 567 U.S. 460 (2012), altered the framework under which juveniles could be sentenced to life imprisonment without the possibility of parole to comply with the requirements of the Eighth Amendment of the United States Constitution against cruel and unusual punishment. In the second case, Montgomery v. Louisiana , 136 S. Ct. 718 (2016), the Court determined that its holding in Miller is retroactive.
¶20 In his postconviction motion, Jackson asserted that the Supreme Court's reasoning in Miller and Montgomery should be applied to his sentence because it is effectively one of life imprisonment without the possibility of parole. As a result, Jackson contended that his sentence is in violation of the Eighth Amendment of the United States Constitution as well as article I, section 6 of the Wisconsin Constitution and, consequently, resentencing is required. Alternatively, Jackson argued that the Miller and Montgomery decisions are collectively a new factor that warrants sentence modification.
¶21 The State distinguished Miller and Montgomery as being limited to situations where a life sentence without the possibility of parole was mandated by state statute. Since Wisconsin does not have such a mandate, and sentences are imposed at the discretion of the trial court, the State argued that the holdings in Miller and Montgomery are inapposite here. Instead, the State contended that the governing cases are State v. Ninham , 2011 WI 33, 333 Wis. 2d 335, 797 N.W.2d 451, and State v. Barbeau , 2016 WI App 51, 370 Wis. 2d 736, 883 N.W.2d 520, both of which concluded that sentences of life imprisonment for juveniles are constitutionally permissible.
¶22 The trial court agreed with the State and denied Jackson's motion in its entirety. This appeal follows.
DISCUSSION
¶23 In this appeal, Jackson is not pursuing the sentence modification argument that he sought in his 2017 postconviction motion, nor is he requesting a new trial. Rather, he seeks resentencing on the premise that under the analyses of Miller and Montgomery regarding the requirements of the Eighth Amendment, his sentence is unconstitutional.
¶24 The Eighth Amendment of the United States Constitution, as well as article I, section 6 of the Wisconsin Constitution, provides protection from cruel and unusual punishment. Ninham , 333 Wis. 2d 335, ¶45. "Generally, we interpret provisions of the Wisconsin Constitution consistent with the Supreme Court's interpretation of parallel provisions of the federal constitution," particularly in cases where, like here, "the text of the provision in our state constitution is virtually identical to its federal counterpart[.]" See id. We review de novo the interpretation of constitutional provisions. See State v. City of Oak Creek , 2000 WI 9, ¶18, 232 Wis. 2d 612, 605 N.W.2d 526.
¶25 Miller and Montgomery are the latest in a series of cases decided by the United States Supreme Court that significantly changed the manner in which juveniles are sentenced. The first case in this series was Roper v. Simmons , 543 U.S. 551 (2005), where the Court held that the Eighth Amendment prohibits imposing the death penalty on juvenile offenders. Id. at 578. The Court's decision was based on distinctions between juvenile offenders and adult offenders, particularly relating to juveniles' lack of maturity, susceptibility to negative influences, and character traits that are "more transitory, less fixed." Id. at 569-70. Indeed, the Court determined that a categorical prohibition was necessary because "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Id. at 573.
¶26 Following Roper was Graham v. Florida , 560 U.S. 48 (2010), where the Supreme Court held that sentencing a juvenile to life imprisonment without parole for a crime other than homicide is unconstitutional. Id. at 82. In its decision, the Court relied on its holding in Roper , noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." Graham , 560 U.S. at 68.
¶27 The Graham decision was followed two years later by Miller . In Miller , the Supreme Court expanded the prohibitions proscribed by the Eighth Amendment regarding juvenile sentences to include mandatory life sentences without the possibility of parole. Miller , 567 U.S. at 465. In its analysis, the Court began with the premise established in Roper and Graham that "children are constitutionally different from adults for purposes of sentencing." Miller , 567 U.S. at 471. The Court identified factors specific to juveniles that are disregarded when a mandatory life sentence is required to be imposed, such as immaturity, awareness of risks and their consequences, the effect of peer pressure, family history, and the potential for rehabilitation. Id. at 477-78. Therefore, the Court held that statutory sentencing schemes that include mandatory life sentences without the possibility of parole for juveniles violate the Eighth Amendment because they "mak[e] youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence[.]" Id. at 479. While the Court declined to consider whether the Eighth Amendment requires a categorical bar on sentences of life imprisonment without parole for juveniles, it indicated that the imposition of "this harshest possible penalty will be uncommon," because after taking youth into consideration, it is difficult to distinguish between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Id. at 479-80 (citations omitted).
¶28 Subsequently in Montgomery , the Supreme Court determined that the holding in Miller was a new "substantive rule of constitutional law" and therefore must be given retroactive effect. Montgomery , 136 S. Ct. at 736. In fact, the Court decided Montgomery specifically to resolve the question of whether the Miller rule was retroactive. Montgomery , 136 S. Ct. at 725. However, the Court was mindful of the potential consequences of deeming the Miller rule retroactive, and thus provided further instruction: "[g]iving Miller retroactive effect ... does not require [s]tates to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. A [s]tate may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." Montgomery , 136 S. Ct. at 736.
¶29 Jackson contends that his sentence constitutes a de facto life-without-parole sentence because he is not eligible for parole until he is 101 years old. Thus, he argues that his sentence violates the Eighth Amendment pursuant to Miller and its retroactive application pursuant to Montgomery , and that he is entitled to resentencing. In contrast, the State asserts that Miller and Montgomery are limited to mandatory life imprisonment sentencing schemes, and did not address discretionary sentencing structures such as that which is in effect in Wisconsin. Moreover, the State points out that the Wisconsin Supreme Court has addressed similar challenges in Ninham and Barbeau , decisions by which we are bound.
¶30 In Ninham , decided the year before Miller , our supreme court reviewed the constitutional challenge of the life imprisonment sentence without the possibility of parole that was imposed on Ninham for first-degree intentional homicide. Ninham , 333 Wis. 2d 335, ¶¶2-3. Ninham was fourteen years old when the crime was committed. Id. , ¶2.
¶31 The court determined that sentencing a fourteen-year-old to life imprisonment without parole eligibility was not categorically unconstitutional. Id. , ¶4. The court considered the Supreme Court's analyses in Roper and Graham , and determined that neither case "foreclose[d] a sentencing court from concluding that a juvenile who commits homicide is sufficiently culpable to deserve life imprisonment without the possibility of parole." Ninham , 333 Wis. 2d 335, ¶77.
¶32 Ninham also sought sentence modification on the grounds that his sentence was unduly harsh and excessive, in violation of the Eighth Amendment. Id. , ¶3. The court rejected that argument, noting that a sentence may be deemed cruel and unusual "only if the sentence is 'so excessive and unusual, and so disproportionate to the offense committed, as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances.' " Id. , ¶85 (citation and one set of quotation marks omitted). The court found that Ninham's sentence was certainly severe but "not disproportionately so" based on the "horrific and senseless" nature of the crime; Ninham, together with a group of friends, had taunted and beaten a thirteen-year-old boy without any provocation, ultimately swinging him over the concrete wall of a parking garage and letting him drop nearly forty-five feet to his death. Id. , ¶¶9-17, 86.
¶33 The Ninham court also rejected the argument that new research regarding the brain development of adolescents was a new factor warranting sentence modification. Id. , ¶92. Citing Roper and Graham , the court concluded that the "new" research referred to by Ninham was merely confirming the fact that there are fundamental differences between the minds of juveniles and adults, a fact that the United States Supreme Court had already recognized. Ninham , 333 Wis. 2d 335, ¶92.
¶34 Barbeau , on the other hand, was decided by this court after Miller , and shortly after Montgomery .[2] Barbeau was convicted of first-degree intentional homicide for killing his great-grandmother with a hatchet when he was thirteen years old. Barbeau , 370 Wis. 2d 736, ¶¶2, 5. The crime was committed in 2012, after the enactment of truth-in-sentencing legislation in Wisconsin. Id. , ¶16. The truth-in-sentencing statutory scheme did away with parole and instead allows for release on extended supervision as determined at the discretion of the sentencing court. Id. , ¶17. Specifically, the truth-in-sentencing statute allows the sentencing court three options when imposing a life imprisonment sentence: (1) eligibility for release to extended supervision after twenty years of initial confinement; (2) eligibility for release to extended supervision some time after twenty years of confinement; or (3) no eligibility for release to extended supervision. WIS. STAT. § 973.014(1g)(a) (2015-2016)[3] ; see also Barbeau , 370 Wis. 2d 736, ¶24.
¶35 Barbeau mounted a categorical challenge to the truth-in-sentencing statute on the grounds that it allows for a juvenile convicted of first-degree intentional homicide to be sentenced to life imprisonment without eligibility for extended supervision.[4] Barbeau , 370 Wis. 2d 736, ¶24. We rejected Barbeau's constitutional arguments. We pointed out that Miller did not strictly prohibit a sentence of life imprisonment without parole for a juvenile, as long as the sentencing court " 'take[s] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " Barbeau , 370 Wis. 2d 736, ¶32 (quoting Miller , 567 U.S. at 480 ). Thus, we concluded that "it is not unconstitutional to sentence a juvenile to life imprisonment without the possibility of supervised release for intentional homicide if the circumstances warrant it." Barbeau , 370 Wis. 2d 736, ¶32.
¶36 We also rejected Barbeau's argument that the truth-in-sentencing statute's mandatory minimum of twenty years of initial confinement is categorically unconstitutional. Id. , ¶35. We recognized the "legitimate penological goals" of deterrence and retribution that were considered by the legislature in implementing this provision of the truth-in-sentencing statute-even for juveniles-and concluded that there was "nothing disproportionate on a constitutional level in this scheme." Id. , ¶43.
¶37 Of course, Ninham and Barbeau are binding precedent on this court. Still, Jackson argues that the trial court's reliance on these cases in denying his postconviction motion was misplaced. First, he argues that the Ninham court did not have the benefit of the Miller decision, and the Barbeau court did not have the benefit of arguments from the parties based on Montgomery . However, the Barbeau court concluded that Miller did not affect the analysis in Ninham . Barbeau , 370 Wis. 2d 736, ¶25. Moreover, the analysis in Montgomery focused on whether the Miller rule was a substantive or procedural change in the law for purposes of determining whether it should be applied retroactively. See Montgomery , 136 S. Ct. at 732. That analysis is not directly relevant to the overarching issue here of whether the Miller rule applies to discretionary life sentences.
¶38 Jackson next argues that the decision in Ninham relied on the Graham court's distinction between homicide and nonhomicide cases, which was rejected in Miller . Specifically, Jackson points to the Miller court's statement that the reasoning in Graham -that there are fundamental differences between juvenile and adult minds-also "implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." Miller , 567 U.S. at 473. However, this court addressed this argument in Barbeau , explicitly stating that Miller did not categorically prohibit sentences of life imprisonment without parole for juveniles as long as the distinctive characteristics of a juvenile offender are taken into consideration. Barbeau , 370 Wis. 2d 736, ¶32 ; see also Miller , 567 U.S. at 483.
¶39 That is precisely what the trial court did here. When sentencing Jackson, the court specifically stated that it was taking Jackson's "youthfulness" into consideration. It further considered his character, personality, and social traits, as well as his relationship with his family, his education, and his work history, as described in the PSI. The court also noted Jackson's psychological evaluation which found no indications of psychopathology. Additionally, the court discussed Jackson's rehabilitative needs, characterizing them as "very limited[.]"
¶40 In short, the trial court took into consideration all of these factors relating to Jackson's age-most of which are the same factors that were discussed in Miller when it was decided almost seventeen years later. Additionally, the trial court considered other relevant sentencing factors and objectives such as the gravity of the crime, the protection of the public, punishment, deterrence, and Jackson's rehabilitative needs.[5] See McCleary v. State , 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971). Using all of this relevant information, the trial court imposed Jackson's sentence, including his parole eligibility date.
¶41 Like the sentence in Ninham , Jackson's sentence is certainly severe, but not disproportionately so based on the circumstances of the crime. See id. , 333 Wis. 2d 335, ¶86. Furthermore, the sentence follows the directive of Miller , which "mandate[d] only that a sentencer follow a certain process-considering an offender's youth and attendant characteristics-before imposing a particular penalty." Id. , 567 U.S. at 483. Indeed, the record indicates that the trial court implicitly determined that Jackson was " 'the rare juvenile offender whose crime reflects irreparable corruption.' " See id. at 479-80 (citations omitted).
¶42 Jackson's final argument is that his case is distinguishable from Ninham and Barbeau because those cases were categorical constitutional challenges, and he is arguing only that his particular sentence is unconstitutional. Based on our analysis here, this argument does not compel a different result. We have already discussed the specifics of Jackson's sentence in the context of the relevant decisions from both state and federal case law, and concluded that Jackson's sentence comports with the directives of those decisions.
¶43 Therefore, we conclude that Jackson's sentence is not unconstitutional. Accordingly, we affirm the trial court's denial of Jackson's most recent postconviction motion.
By the Court. -Order affirmed.
Not recommended for publication in the official reports.

While this appeal was pending, Jackson requested that we consider, on our own motion, certifying his case to the Wisconsin Supreme Court. He noted that this court had recently certified two similar cases, State v. Walker , 2016AP1058, and State v. Ninham , 2016AP2098.
We decline Jackson's request. We further note that our supreme court denied the petition for certification on Walker and Ninham on June 11, 2018.

Jackson points out that the briefing for State v. Barbeau , 2016 WI App 51, 370 Wis. 2d 736, 883 N.W.2d 520, was completed prior to the United States Supreme Court's release of Montgomery v. Louisiana , 136 S. Ct. 718 (2016), and thus the parties were not able to reference Montgomery in their arguments.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

This court concluded that Barbeau did not have standing to challenge the truth-in-sentencing statute on those grounds because his sentence included extended supervision. Barbeau , 370 Wis. 2d 736, ¶24. Nevertheless, we decided to address the merits of Barbeau's argument in light of Miller v. Alabama , 567 U.S. 460 (2012). Barbeau , 370 Wis. 2d 736, ¶25.

We further note that in State v. Gallion , 2004 WI 42, 270 Wis. 2d 535, 678 N.W.2d 197, a decision that affirmed and clarified the standards and requirements for sentencing as set forth in McCleary v. State , 49 Wis. 2d 263, 182 N.W.2d 512 (1971), our supreme court explained with more particularity the sentencing objectives and goals that are to be discussed by a trial court at sentencing in light of the truth-in-sentencing statute. See Gallion , 270 Wis. 2d 535, ¶¶33-44. In sentencing Jackson, the trial court intuitively utilized the directives of Gallion , although Gallion would not be decided for nearly nine years after Jackson was sentenced.