**2021 WI APP 17**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2020AP29-CR

†Petition for Review filed.

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**WESTLEY D. WHITAKER,**

**DEFENDANT-APPELLANT. †**

| | |
|---|---|
| Opinion Filed: | February 4, 2021 |
| Submitted on Briefs: | October 16, 2020 |
| JUDGES: | Blanchard, Kloppenburg, and Nashold, JJ. |
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher M. Zachar* of *Zachar Law Office, LLC,* La Crosse. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Daniel J. O'Brien*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

**2021 WI App 17**

**COURT OF APPEALS DECISION DATED AND FILED**

**February 4, 2021**

**Sheila T. Reiff**
**Clerk of Court of Appeals**

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.**

**Appeal No. 2020AP29-CR** **Cir. Ct. No. 2017CF163**

**STATE OF WISCONSIN** **IN COURT OF APPEALS**

---

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**WESTLEY D. WHITAKER,**

**DEFENDANT-APPELLANT.**

---

APPEAL from a judgment and an order of the circuit court for Vernon County: DARCY JO ROOD, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Nashold, JJ.

¶1 BLANCHARD, J. Westley Whitaker was 26 when he entered a plea of no contest to a charge that he sexually assaulted one of his sisters in January 2007, when he was 14 and she was 12. Before sentencing, Whitaker admitted that this sexual assault was only one of many that he perpetrated against

the same girl, and also admitted that during the same time period he had sexual contact with two other younger sisters. These assaults all took place while the siblings lived in a household that was part of an Amish community in Vernon County. The circuit court sentenced Whitaker to four years of imprisonment.

¶2 Whitaker challenges one of the court's rationales for sentencing Whitaker to prison. This rationale was to encourage effective interventions by adults in the pertinent Amish community to protect girls from sexual assaults by family members. One way that the court phrased this was to say that it aimed to encourage elders to refrain from "keep[ing]" the issue of child sexual assaults "within the community," instead of being addressed in the "judicial system." The court based this rationale on the following two factual premises, which were advanced by both parties. First, during the period in which Whitaker was committing the sexual assaults, adults in Whitaker's Amish community became aware of his conduct but failed to take effective steps to end it. Second, this was not an isolated failure, but instead part of an ongoing pattern of similar failures by adults in the same Amish community to prevent child sexual assault.

¶3 Whitaker argues that the sentence: (1) violates his rights under the First Amendment and the Fourteenth Amendment Due Process Clause, because the court considered his religious beliefs as a member of the Amish community and his association with the Amish community for religious purposes; (2) violates his rights under the Eighth Amendment as "cruel and unusual punishment" and his due process rights, primarily because he stopped the sexual assaults when he was a 14-year-old adolescent; and (3) is defective under pertinent case law because the court failed to adequately explain the basis for either major component of the bifurcated sentence, two years of initial confinement and two years of extended supervision.

¶4 On the first issue, we assume without deciding that the circuit court's rationale potentially infringed on constitutionally protected religious beliefs or the right to associate with a religious community. Even with this assumption, we conclude that Whitaker fails to carry his burden of showing by clear and convincing evidence that the court's sentencing rationale was improper. We discern a reliable nexus between the circumstances of Whitaker's sexual assaults and the court's use of the sentence to encourage adults to protect girls in the Amish community from sexual assaults, including if necessary by communicating with authorities outside the community such as social workers or police. Separately, we conclude that the sentence did not violate the Eighth Amendment or the Due Process Clause, and also that the court provided sufficient explanations for both components of the sentence. Accordingly, we affirm the judgment of conviction and the order denying Whitaker's motion for the postconviction relief.

## BACKGROUND

¶5 In 2017, the State charged Whitaker, then 25, with three counts of first degree child sexual assault for sexual contact with A.B. when she was under the age of 13, in violation of WIS. STAT. § 948.02(1)(e) (2017-18).[1] The same criminal complaint charged him with three counts of the same offense for sexual contact with C.D., when she was also younger than 13. All six charged offenses were alleged to have occurred during the years 2005 to 2007.

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted. Separately, we use fictitious initials to identify the victims.

¶6 Whitaker acknowledged in advance of sentencing that the following allegations contained in the complaint were true. A.B., C.D., and a third victim, E.F., are younger sisters of Whitaker. A.B. reported to county human services employees in June 2017 that, during the years 2005 to 2007, Whitaker subjected her to "almost" daily penis-to-vagina sexual intercourse. C.D. reported that, starting in 2005 when she was seven and ending when she was around 10, Whitaker sexually assaulted her on multiple occasions. E.F. reported that when she was six or seven, Whitaker took her to a field, directed her to undress, and tried unsuccessfully to penetrate her vagina with his penis.

¶7 In September 2017 and while living outside Wisconsin, Whitaker contacted law enforcement and admitted to conduct generally matching that described in the complaint and summarized above. At a January 2019 plea hearing, the circuit court accepted Whitaker's plea of no contest to first degree sexual assault of a child under the age of 13 by having sexual contact with A.B. on January 1, 2007, in violation of WIS. STAT. § 948.02(1)(e). The other charges involving A.B. and all of the charges involving C.D. were dismissed but read in for sentencing purposes. The parties agreed that they would both be free to recommend any sentence options.

¶8 During the plea hearing, Whitaker and his attorney explained that Whitaker had completed eight years of schooling and that he had grown up in an "Amish community," with beliefs "similar" to that of "Old Order Amish."[2]

---

[2] Seemingly conflicting at least slightly with this representation of being merely "similar," Whitaker stated in his motion for postconviction relief that, when he was growing up, he and his family "were members of an Old Order Amish community." In advance of sentencing, Whitaker described his family's religion as Amish, and explained that, at the time he moved out

(continued)

¶9 We pause to note that the record provides only limited information regarding the community of Amish adherents to which Whitaker's family belonged when he was an adolescent or regarding the community's potential continuing existence by the time of sentencing. When we refer to "the Amish community," we mean the particular group or congregation of Amish adherents that Whitaker's parents belonged to when Whitaker was aged around 12-14 (when the sexual assaults occurred) and that apparently continued to exist at the time of Whitaker's sentencing. We are not referring broadly to all persons or groups in the Vernon County area who may have identified as Amish at any time between 2005 and the sentencing. For factual context, we note that our supreme court in 1971 made the general observation that the independent religious sect Amish is "dedicated" "to maintaining the old practices and resisting any capitulation to the sin of worldliness," with the "Old Order Amish" being "the most conservative and traditional of the several branches of the sect." ***State v. Yoder***, 49 Wis. 2d 430, 434-35, 182 N.W.2d 539 (1971), *aff'd*, ***Wisconsin v. Yoder***, 406 U.S. 205 (1972). We further note that the circuit court here had access to a statement by Whitaker that, in the Amish "culture" in which he was raised, "children do not interact with the opposite sex," and "sex is considered off limits and taboo …." "It isn't okay to talk about."

¶10 Returning to our case chronology, in advance of sentencing, the circuit court and the parties had the opportunity to review two confidential documents: a presentence investigation report prepared by the Department of

---

of the family home in January 2013, the family was "similar to Mennonites." Whitaker also stated before sentencing that he did not "attend church."

Corrections and an "Estimate of Risk of Sexual Offense Recidivism" prepared by a licensed clinical social worker at Whitaker's request. These documents both concluded that Whitaker presented little or no special risk of committing child sexual assault again. Based primarily on that mutual conclusion, Whitaker moved for an order exempting him from sex offender registration, which was not opposed by the State. *See* WIS. STAT. § 301.45(1m) (potential exception for underage sexual activity). Whitaker argued that the court would not be "sentencing a twenty-five year old sex offender," but instead a "boy" who inhabited "a world very different from his contemporaries," and who had grown up to become "a pro-social, low-risk father who tried to make his childhood mistakes right by confessing to the police." In granting the motion for exemption from registration, the court described the case as "unusual," and further explained:

> Mr. Whitaker committed these very serious offenses, but he was between the ages of 12 to 14. He was in an Amish community. And … I don't believe he poses a risk. I believe … this was juvenile, hormone-driven [behavior] in ... a community and [in] a family that wasn't protecting the daughters.

¶11 We now summarize the sentencing recommendations and sentence. A.B. and E.F. each requested a prison sentence of "two to five years."[3] The Department of Corrections recommended three years of probation, with a condition of 30 days in jail, emphasizing evidence that Whitaker was not a risk to reoffend. The State recommended three years of initial confinement and three years of extended supervision, emphasizing the harm done to the victims over a long period of time and the fact that Whitaker did not confess to law enforcement

[3] The court did not receive a victim impact statement from C.D.

until after A.B. made her disclosures to law enforcement. The defense recommended only mandatory costs and fees, emphasizing: that the sexual assaults would have been treated as acts of juvenile delinquency if they had been addressed in the court system when Whitaker was around 14; the long passage of time since the last sexual assault; the lack of evidence that Whitaker was a risk to commit child sexual assault again; his admissions of guilt to police and the court; and the significant negative collateral consequences for him that will arise from a conviction for child sexual assault.

¶12 The court sentenced Whitaker to two years of initial confinement and two years of extended supervision, although the court granted Whitaker's request to stay the sentence pending appellate review and as noted did not require him to register as a sex offender. The court observed that it faced a "very difficult" decision, in part because of Whitaker's youth when he committed the sexual assaults. Primarily for this reason, the court explained that it viewed the six-year prison term recommended by the State was excessive. Further mitigating facts found by the court were that Whitaker's "current risk of reoffending is zero" and that he had no need for "rehabilitation." Thus, the court effectively took off the table the rationale of specifically deterring Whitaker from committing future child sexual assaults, as opposed to general deterrence of others from sexually assaulting children. The court also noted that Whitaker eventually "came forward" and took responsibility for the sexual assaults, did not require his sister-victims to testify at a trial, and expressed remorse that the court characterized as "sincere."

¶13 On the aggravation side of the ledger, the court observed that Whitaker did not commit a single act of child sexual assault, but instead "a thousand" of them. "It was years of abuse." The court characterized the abuse as

"abhorrent," in part because, in A.B.'s home, "the one place where [A.B. was] supposed to feel safety, with her parents' support, she didn't have it. And she didn't have the support of" Whitaker, whom she considered "her beloved older brother." The court found that A.B. had been "destroyed," not only by the sexual abuse itself, but also by the accompanying "threats" that Whitaker made to her not to reveal the abuse to others.

¶14 As described in more detail in the Discussion section below, the parties and the circuit court discussed what the parties and the court agreed was a problem with child sexual assaults in the Amish community exemplified by the facts of this case. On this topic, the court conveyed the idea that it wanted the sentence to be harsh enough to encourage adults in the Amish community to take steps to prevent sexual assaults of girls, including as necessary communicating with authorities such as social workers or police. The court stated that "a prison sentence is the only way to send the message to Mr. Whitaker and to the community that this is totally unacceptable behavior…. And I hope that the elders in the community pay attention to this."

¶15 Based on all of the aggravating factors, the court stated, the defense-requested sentence of "no confinement would depreciate the seriousness of this offense," and would fail to send the required "message" to Whitaker, because "punishing Mr. Whitaker for his behavior [is] critical." The court also expressed the hope that a prison sentence, as was requested by A.B. and E.F., "can help the family heal."

¶16 Whitaker filed a motion for postconviction relief, raising the same three issues raised in this appeal. The State asked the circuit court to deny the motion in its entirety. The court heard oral arguments from the parties and

rejected each of the three arguments pertinent to this appeal. Whitaker appeals the judgment of conviction and the order denying his motion for postconviction relief.

## DISCUSSION

¶17 The following standards of review are applicable to multiple issues raised on appeal:

> A circuit court's sentence is a discretionary decision. ***McCleary v. State***, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971). On appeal, review is limited to determining if discretion was erroneously exercised. ***State v. Gallion***, 2004 WI 42, ¶17, 270 Wis. 2d 535, 678 N.W.2d 197. An exercise of discretion is erroneous if it is based on an error of fact or law. ***Zarder v. Humana Ins. Co.***, 2010 WI 35, ¶21, 324 Wis. 2d 325, 782 N.W.2d 682. Additionally, a circuit court erroneously exercises its sentencing discretion when it "actually relies on clearly irrelevant or improper factors." ***State v. Alexander***, 2015 WI 6, ¶17, 360 Wis. 2d 292, 858 N.W.2d 662 (quoting ***State v. Harris***, 2010 WI 79, ¶66, 326 Wis. 2d 685, 786 N.W.2d 409).

***State v. Dalton***, 2018 WI 85, ¶36, 383 Wis. 2d 147, 914 N.W.2d 120. "'[W]e are obliged to search the record to determine whether in the exercise of proper discretion the sentence imposed can be sustained,'" and "'it is ... our duty to affirm the sentence on appeal if from the facts of record [the sentence] is sustainable as a proper discretionary act.'" ***Gallion***, 270 Wis. 2d 535, ¶80 (emphasis removed) (quoting ***McCleary***, 49 Wis. 2d at 282).

¶18 It is the defendant's burden to show by clear and convincing evidence that the court actually relied on an improper factor in exercising its sentencing discretion. ***Alexander***, 360 Wis. 2d 292, ¶17.

## I. FIRST AMENDMENT / DUE PROCESS

¶19 Whitaker argues that the sentence violates his rights under the First Amendment and the Fourteenth Amendment Due Process Clause because the circuit court improperly considered his "religious beliefs and association with a religious community when it held that a goal of sentencing was to deter sexual assault[s] within the Amish community." As we explain further below, we conclude that Whitaker's argument fails because the court identified a reliable nexus, which the court within its sentencing discretion could rely on, between the circumstances of the sexual assaults that Whitaker committed and what we assume are constitutional rights potentially infringed by the challenged sentencing rationale. Taking into account undisputed factual premises, the circuit court relied in part on the legitimate rationale of protecting children in the Amish community by encouraging its adults to intervene and prevent child sexual assaults, including communicating with authorities as needed.

### A. Pertinent Legal Standards

¶20 Among the factors that are generally "improper for the circuit court to consider at sentencing[,] and therefore violate a defendant's right to due process[,]" are "the defendant's or victim's religion," because as a general rule religious beliefs and associated practices are protected from governmental interference by the First Amendment and Art. I, § 18, of the Wisconsin

Constitution.[4] *See* ***Alexander***, 360 Wis. 2d 292, ¶23 & n.14 (citing ***State v. Ninham***, 2011 WI 33, ¶96, 333 Wis. 2d 335, 797 N.W.2d 451).

¶21 Despite that general rule, however, a sentencing court may consider a defendant's religious beliefs and associated practices so long as the court identifies a "reliable nexus" between the defendant's criminal conduct and the religious beliefs. ***State v. Fuerst***, 181 Wis. 2d 903, 910-13, 916, 512 N.W.2d 243 (Ct. App. 1994). We determined in ***Fuerst*** that it violated the defendant's constitutional right to religious freedom for the sentencing court to take into consideration that the defendant lacked religious convictions and failed to attend religious services regularly. ***Id.*** at 911-13. We remanded for resentencing because "the record demonstrates no relationship between Fuerst's criminal conduct and Fuerst's beliefs system and his decision not to regularly attend church." ***Id.*** at 913. The court in ***Fuerst*** applied the three-pronged test in ***Lemon***

---

[4] The First Amendment to the United States Constitution, which applies to the states by virtue of the Fourteenth Amendment, provides in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...."

Article 1, § 18, of the Wisconsin Constitution provides in pertinent part:

> The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; ….

The parties here present no arguments based on the Wisconsin Constitution that diverge from arguments based on the U.S. Constitution.

***v. Kurtzman***, 403 U.S. 602 (1971) (***Lemon - Supreme Court***).[5] ***Fuerst***, 181 Wis. 2d at 911-12.

¶22 The same analysis applies to a consideration by a sentencing court of a defendant's rights protected under the First Amendment to freedom of expression and to association. *See* ***Dawson v. Delaware***, 503 U.S. 159, 166-67 (1992) (evidence of a defendant's protected beliefs or associations are improper and irrelevant considerations unless the sentencing court has a basis to tie that evidence to the offense of conviction or to undermine purportedly mitigating evidence); ***Wisconsin v. Mitchell***, 508 U.S. 476, 486-88 (1993) (evidence of defendant's protected beliefs and associations are admissible at sentencing if relevant to establish aggravating animus or intent or other relevant sentencing factor). Put differently, a court may not increase a sentence based on protected associational activities unless there is an "identifiable link" between the activities and criminal conduct. *See* ***State v. J.E.B.***, 161 Wis. 2d 655, 665-69, 469 N.W.2d 192 (Ct. App. 1991) (citing and extensively discussing ***United States v. Lemon***, 723 F.2d 922 (D.C. Cir. 1983) (***Lemon - D.C. Circuit***), in which the federal appellate court vacated a sentence on the ground that the sentencing court relied on information about Lemon's alleged associations with a group but failed to cite

---

[5] To distinguish between ***Lemon v. Kurtzman***, 403 U.S. 602 (1971), and ***United States v. Lemon***, 723 F.2d 922 (D.C. Cir. 1983), which is discussed below, we call the first "***Lemon - Supreme Court***" and the second "***Lemon - D.C. Circuit***."

A government action passes the ***Lemon - Supreme Court*** test only if it (1) has a secular legislative purpose; (2) has as its principal or primary effect neither advancement nor inhibition of religion; (3) does not foster, "an excessive government entanglement with religion." ***Lemon - Supreme Court***, 403 U.S. at 612-13 (internal citations omitted).

evidence that the group had illegal aims or that Lemon intended to further illegal aims).

**B. Additional Background**

¶23 At sentencing, the prosecutor primarily addressed the need for a "punitive consequence" because of the nature of Whitaker's repeated sexual assaults of his younger sisters, including using threats. However, the prosecutor also discussed the topic that is the focus of Whitaker's first argument, namely, what the prosecutor described as the "failure" of the parents of Whitaker and the victims "to address" the sexual assaults by Whitaker after the parents became aware of this conduct at the time. The prosecutor's position was consistent with statements before the court from Whitaker and A.B. alleging that adults became aware of sexual assaults and took only ineffective steps to stop them.[6]

¶24 The prosecutor, the district attorney of Vernon County, then made a broader statement:

> We've dealt with these situations, Your Honor, in the past in the Amish community, where we have had sisters,

[6] Whitaker's counsel stated in a letter to the court that "[a]lthough responsible adults were aware of Mr. Whitaker's conduct with his sisters, they were discouraged from seeking intervention from healthcare, counseling, educational or social systems," and that "several adults were aware of Mr. Whitaker's conduct contemporaneous with the offenses, but declined to address it in a manner that would be expected in 'mainstream' society."

A.B. stated that her parents became aware at the time that Whitaker was committing sexual assaults and they were temporarily successful in getting Whitaker to stop, but only for a "couple months." A.B. further stated that her parents blamed her for Whitaker's assaults on her. Her father's view was his "'sons [first] before his daughters,'" and her mother's view was that she "'can't blame [Whitaker], so she blamed us.'" Her father "wanted this to stay out of the court system" and for Whitaker to talk A.B. "'off the fence.'" In a related vein, E.F. stated that her parents "'will side with [Whitaker].'"

> daughters[,] [who] have been sexually assaulted, and then they end up actually leaving the Amish community, and then it gets reported years later.
>
> So I understand the culture surrounding the Amish, that they want to handle these situations internally. And a lot of times what they end up doing is they end up sending the people off to Ohio, [to] one of the treatment places that a lot of these individuals in the past have gone to.
>
> So … there's a lot of things that are going on as to why this wasn't reported, why it wasn't addressed 12 or 14 years ago. But none of that falls back on [A.B., C.D., or E.F.].

¶25 As pertinent to this issue, defense counsel noted that he had been a public defender in Vernon County for five years and made the following observations:

> I think it's … important to note that there were adults who were aware of [Whitaker's sexual assault] conduct when it was happening. They went to their religious elders at the time, and it was recommended that the allegations remain within the community. So even when the adults had the opportunity to intervene, they chose not to and treated it—and I've handled several sexual assault cases from the Amish community. This is not unusual. I'm sure the Court and [the prosecutor] are well aware of that. But they treated it as it is traditionally treated in the Amish [community], and as a result there was never any meaningful intervention[,] even though people were aware that this happened.

¶26 We now summarize remarks of the circuit court related to the rationale that Whitaker challenges. As noted above, in granting Whitaker's motion for exemption from sex offender registration, the court stated that Whitaker was raised in "a community and [in] a family that wasn't protecting the daughters." The court tied this concept to a sentencing rationale that the court literally stated at times in terms of "deterrence" of conduct by adults in the Amish community. We explain below why we construe this rationale as aimed at

encouraging child protection efforts in the Amish community that deter child sexual assaults and not aimed at deterring adults in the Amish community from committing offenses.

¶27 More specifically, the circuit court noted that ***Gallion*** identifies "deterrence to others" as one valid sentencing rationale. *See* ***Gallion***, 270 Wis. 2d 535, ¶40; *see also* ***McCleary***, 49 Wis. 2d at 271 (referring to "the function of the law to deter similar acts by the defendant and others").[7] The court said:

> I believe the relevant [***Gallion***] factors are punishment, and also deterrence of others, hopefully deterrence of others in the Amish community. I happen to live in the midst of an Amish community.… They're my neighbors.
>
> And sexual assault of sisters is not something that is accepted. I understand it often happens and that it is dealt with in the community. And that's not sufficient. That's not sufficient when it is not a one-time thing and not when the women, the daughters, the wives in the Amish community are not empowered to come forward. They do

[7] Explaining more fully, under ***State v. Gallion***, 2004 WI 42, 270 Wis. 2d 535, 678 N.W.2d 197, a sentencing court must "specify the objectives of the sentence on the record," which "include, but are not limited to, the protection of the community, punishment of the defendant, rehabilitation of the defendant, and deterrence to others." ***Id.***, ¶40. Sentencing courts are also required to "identify the factors that were considered in arriving at the sentence and indicate how those factors fit the objectives and influence the decision," which may include the following:

> "(1) [the defendant's] record of criminal offenses; (2) history of undesirable behavior pattern; (3) the defendant's personality, character and social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention."

***Id.***, ¶43 n.11 (quoting ***Harris v. State***, 75 Wis. 2d 513, 519-20, 250 N.W.2d 7 (1977)).

> not have the ability because of their upbringing. They are discouraged from bringing these issues forward.

¶28 The court then expressly recognized a risk that sentencing Whitaker to prison might have an unintended result. It might cause members of the Amish community to *refrain* from alerting authorities to child sexual assaults, to avoid potential prison sentences. Despite that risk, the court said, it wanted to create "deterrence of the community from permitting their sons, their husbands[,] to engage in this. But generally, in my experience, it's the sons."[8] The court later added, "I'm hoping that this sentence deters, as I said, the community."

¶29 Immediately after pronouncing the sentence, the court said:

> I think that … a prison sentence is the only way to send the message to Mr. Whitaker and to the community that this is totally unacceptable behavior. And perhaps it now can help the family heal. And I hope that the elders in the community pay attention to this.

¶30 At the hearing on the postconviction motion, the court further explained this aspect of its rationale by saying that "the desire of the elders [is] to keep it within the community," with the result that child sexual assault cases "wouldn't be [addressed in] our judicial system."

[8] The circuit court did not explicitly identify the source of "my experience." It appears from context, however, that the court was referring to its awareness of the circumstances surrounding some sexual assaults of girls in the Amish community based on other cases that had come before the court. The court explained at sentencing that "this is not the first case I've had with someone from the Amish community." A sentencing court may generally "access[] its institutional memory," "reaching back into [its] memories without the aid of hard-copy files," *see* ***State v. Counihan***, 2020 WI 12, ¶48, 390 Wis. 2d 172, 938 N.W.2d 530, and Whitaker does not challenge the court's having done so here.

**C. Analysis**

¶31 Whitaker argues that the circuit court improperly sentenced him more harshly based on his constitutional rights to religious belief and to associate with a religious community, relying on an invalid application of the goal of general deterrence. We now explain why we conclude that the court is best understood as having relied on the rationale of protecting children from sexual assaults, whether or not this could qualify as a general deterrence rationale. Then we explain why we conclude that, assuming that application of the challenged rationale potentially infringed on the exercise of constitutional rights, Whitaker fails to show by clear and convincing evidence that the court could not properly apply the child protection rationale here. Rather, we conclude that the court could properly apply this rationale because there was a reliable nexus between the circumstances of the sexual assaults and the assumed potential infringement.

¶32 We begin by addressing Whitaker's subargument challenging the circuit court's reliance on the rationale of general deterrence. One way that Whitaker expresses this is to argue that the court improperly expanded "the definition of deterrence beyond preventing crime to encouraging the reporting of crime." More generally, he suggests that the court relied on sentencing considerations that are not recognized in Wisconsin law.

¶33 It is true that, as reflected in the summaries above, the sentencing court spoke in terms of deterrence, which is typically discussed in case law as either "specific deterrence" (which the court here took off the table by finding no risk that Whitaker would commit child sexual assault again) or "general deterrence," which is one valid sentencing rationale under such authority as ***Gallion*** and ***McCleary***. *See* ***Gallion***, 270 Wis. 2d 535, ¶40 (proper sentencing

"objectives include, but are not limited to, the protection of the community, punishment of the defendant, rehabilitation of the defendant, and *deterrence to others*" (emphasis added)); ***McCleary***, 49 Wis. 2d at 271 (referring to "the function of the law to deter similar acts by the defendant *and others*" (emphasis added)). However, as Whitaker points out, general deterrence is typically understood as aiming to directly deter potential offenders from committing the same kind of crime as the person being sentenced—that is, as a direct warning or example to other potential law breakers to dissuade them from committing similar acts. *See* ***Gallion***, 270 Wis. 2d 535, ¶61 ("The [sentencing] court also observed that society has an interest in punishing Gallion so that his sentence might serve as a general deterrence against drunk driving."); *see also* ***United States v. Foss***, 501 F.2d 522, 527 (1st Cir. 1974) ("the view that punishment should fit the offender has never yet been held to eliminate general deterrence as a factor to be considered along with others[,] … even though general deterrence concerns itself not with the individual offender but with the sentence's impact on others."). And here, as Whitaker acknowledges, the circuit court could not properly be understood as seeking directly to deter potential perpetrators.[9] Rather, as we next explain, the

[9] The circuit court was not presented with any allegation that anyone violated the mandatory reporting requirements found in WIS. STAT. § 48.981 or related law. The State refers to child sexual assaults in the Amish community being "covered up" and of "[o]bstruct[tionist]" conduct, which implies active attempts to conceal criminal conduct and at least potential direct or accomplice criminal liability. But these are speculative references at best. On this topic, Whitaker appropriately distinguishes this case from those in which a sentencing court might, for example, consider a defendant's affiliation with a religion that promotes the use of narcotics in violation of the law. *See* ***State v. Fuerst***, 181 Wis. 2d 903, 913, 512 N.W.2d 243 (Ct. App. 1994) ("[I]t would be permissible for a court sentencing a defendant convicted of drug offenses to consider the defendant's religious practices as a factor at sentencing if those religious practices involve the use of illegal drugs.").

court sought to deter child sexual assaults by encouraging child protection efforts in the Amish community.

¶34 The circuit court's challenged rationale is a more recognizable application of a different, also valid, set of sentencing considerations explained in ***Gallion*** and other precedent. Sentencing courts are required to consider the overall objective of "the protection of the public," and may also consider as a specific factor "'the rights of the public,'" which we conclude necessarily includes the rights of children to be protected from sexual assaults. *See* ***Gallion***, 270 Wis. 2d 535, ¶¶23, 40, 43 n.11, 44 (quoting ***Harris v. State***, 75 Wis. 2d 513, 519-20, 250 N.W.2d 7 (1977)); ***State v. Oakley***, 2001 WI 103, ¶12, 245 Wis. 2d 447, 629 N.W.2d 200 ("In sentencing, a Wisconsin judge can take into account a broad array of factors, including the gravity of the offense and need for protection of the public and potential victims."), *modified on other grounds*, 2001 WI 123, 248 Wis. 2d 654, 635 N.W.2d 760. Courts typically rely on the "protection of the public" objective based on explicit concern that the public be protected from the sentenced defendant. *See, e.g.*, ***State v. Fisher***, 2005 WI App 175, ¶25, 285 Wis. 2d 433, 702 N.W.2d 56 (addressing "needs of protecting the public" based on "the threat Fisher posed to the community"). However, the opportunity for a sentencing court to consider "the rights of the public" factor, which fits within the broader "protection of the public" objective, must at a minimum include the rationale of protecting children from sexual assault. It is self-evident that children are members of the public and that they have the right to be protected from sexual assaults.

¶35 ***Gallion*** stressed the need for sentencing courts to explain the "linkage" between a sentence imposed and the court's sentencing intentions, to demonstrate that "'discretion was in fact exercised and the basis of that exercise of

discretion [is] set forth,'" and also to help ensure that courts do not rely on any *improper* objectives or factors. *See* ***Gallion***, 270 Wis. 2d 535, ¶¶19-51, 76 (quoting ***McCleary***, 49 Wis. 2d at 277). In making those points, however, the court explicitly left open a broad array of nonexclusive factors that courts could consider in making "individualized" sentencing decisions, so long as they do not rely on improper considerations. *See* ***id.***

¶36 Here, the circuit court explained that it aimed to protect girls in the Amish community from sexual assaults, explicitly expressing concern about how this case revealed "a community and a family that wasn't protecting the daughters." With this aim in mind, the court's thinking appeared to be that a prison sentence is needed in part to create an additional incentive for adults in the Amish community to effectively intervene when they learn of child sexual assaults, including communicating with authorities such as social workers or police as necessary—instead of, as the court phrased it, "keep[ing]" child sexual assaults "within the community." One basis for this approach was the apparent view that a prison sentence is needed in part to teach or remind adults in the Amish community that a potential prison sentence awaits a man who, as a boy, sexually assaulted another child, but who avoided involvement in the juvenile justice system because his delinquent conduct was not adequately addressed while he was younger than 17.

¶37 Even if the circuit court mislabeled its sentencing rationale, this could not constitute reversible error because the apt label is readily discernable as public protection, in particular child protection. Under the standards of review cited above in ¶17, we will not reverse the court's exercise of its sentencing discretion based on a mere mislabeling of a sentencing rationale when we can discern a rationale that is not improper. *See* ***Dalton***, 383 Wis. 2d 147, ¶36; ***Fisher***,

285 Wis. 2d 433, ¶25. For these reasons, we analyze the court's rationale as child protection. By this we mean encouraging adults in the Amish community to protect girls from sexual assault, including if necessary by alerting authorities such as social workers or police to child sexual assaults while perpetrators are young, instead of waiting for potential, eventual responses in criminal court.

¶38 Whitaker fails to develop an argument that it was improper for the court to consider as one sentencing factor the rights of children as members of the public to be protected from sexual assaults. Without explanation or support, he posits that "[r]eluctance by the Amish community to engage the criminal justice system does not drive criminal activity by its membership." One problem with any argument based on this assertion is that the circuit court's rationale involved encouraging, as might be necessary, engagement with authorities such as social workers or police while perpetrators are still young, *before* engagement with the criminal justice system becomes necessary. But the broader problem is that, as we have explained, the parties and the circuit court operated from shared factual premises that inadequate responses to child sexual assault in the Amish community allowed sexual assaults to occur in this case and also risk continuing to allow child sexual assaults.[10] For these reasons, we reject Whitaker's subargument

[10] There was striking unanimity at sentencing on these two factual premises. First, the circuit court and the parties agreed that Whitaker's parents were contemporaneously and *actually aware* (not merely suspicious) that Whitaker was engaging in sexual assaults and, after consulting with Amish elders about how to respond, reached a collective decision to, in the words of defense counsel, make no "meaningful intervention." Second, the court and the parties agreed that this failure was, in the words of defense counsel, a "traditional[]" response in the Amish community to incidents of child sexual assault. Further, Whitaker does not argue that the circuit court relied on inaccurate information, or that the court was obligated to point to evidence on these topics beyond what was contained in the record or agreed to by the parties. In other cases in which analogous propositions are raised, there might well be disputes of fact, but here there was only agreement between the parties, which was accepted as true by the court.

that the court relied on sentencing considerations not recognized in Wisconsin law.[11]

¶39 This leaves Whitaker's core argument that the court sentenced Whitaker to prison partly on the unjustifiable basis of infringing on constitutional rights. *See* ***J.E.B.***, 161 Wis. 2d at 661 ("Unjustifiable bases for a sentence include irrelevant or improper considerations."). We conclude that this argument fails in light of the reliable nexus that is evident in the court's reasoning between the circumstances of the sexual assaults here and what we assume to be potentially infringed constitutional rights to religious belief or to associate with a religious community.

¶40 We begin with the circuit court's purported reliance on religious beliefs, before turning to the right to associate with a religious community. For several reasons that we note in the margin, we question whether Whitaker sufficiently develops and supports the contention that the circuit court actually relied on any religious belief or related practice in making its sentencing decision.[12] However, for reasons we now explain, we assume without deciding

---

[11] In a brief reference, Whitaker asserts that the challenged sentencing rationale here was improper because our state legislature has created two exclusive means by which Wisconsin courts may "address institutional failures of a civil or religious organization to protect children": "statutory reporting requirements with a criminal sanction" and "civil action[s]," the nature of which Whitaker does not specify. This is an unclear, undeveloped concept that appears only in the reply brief. It is not supported by reference to legal authority and includes no attempt to explain how this proposition could be consistent with case law establishing broad circuit court sentencing discretion. We reject it on all those grounds. *See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

[12] Whitaker's postconviction motion did not include any clear, supported reference to a religious belief of the Amish community here. He merely made a passing reference to ***Wisconsin v. Yoder***, 406 U.S. 205 (1972). His opening briefing on appeal makes no substantive reference to any particular purported religious belief, and he fails to clearly identify an established religious (continued)

that the circuit court's comments raised a reasonable inference that it attributed the undisputed lack of effective intervention by Amish adults and ongoing pattern of similar failures to one or more religious beliefs of the Amish adults.

¶41 First, at least by the time of his reply brief, Whitaker asserts that the circuit court expressed a sentencing goal "to force the Amish to interact more regularly with secular authorities," thereby seeking to "regulate" unspecified "social and moral standards of the Amish community." This states a theory that the court's child protection rationale could be construed as directing adults in the Amish community to report incidents of child sexual assault to authorities such as social workers or police officers in a manner or to an extent that would violate one or more religious beliefs or associated practices. Second, the prosecutor argued at the postconviction hearing that the circuit court had based its sentencing decision on how the Amish community "likes to handle these things within their culture." In a similar vein, the court suggested at the postconviction hearing that it intended to address a "lifestyle" in the Amish community. The line between "culture" or "lifestyle" and religious belief or associated practice may be murky at best. Third,

---

tenet or precept infringed by the challenged sentencing rationale. For example, we find no reference in the record to a sacred text or oral tradition, such as any version of a Christian Bible or other text or oral tradition of apparent religious significance. Moreover, the sentencing judge never referred to a religious belief (or lack of belief) that she herself personally held, nor to a religious belief, as such, that any present or former member of the Amish community held. *Cf.* ***State v. Betters***, 2013 WI App 85, ¶4, 349 Wis. 2d 428, 835 N.W.2d 249 (addressing argument that circuit court relied on improper religious considerations when it remarked during a sentencing for sexual assault of a child that "'every child is a gift from God'" and indicated that crime was "'an abomination in the sight of God and in the sight of man'"). Here, the judge did not suggest that Whitaker had offended or betrayed any religious belief of hers. In sum, while we rely on the assumptions stated in the text to resolve this appeal, Whitaker has failed to establish, based on any stipulation or evidence in the record, that according to the dictates of their faith, members of the Amish community are under all circumstances prohibited or discouraged from communication with authorities about child sexual assaults.

the State does not now argue that the court did not actually rely on religious beliefs.[13]

¶42 Turning to the freedom of association doctrine, Whitaker appears to rely on the category of this doctrine that is based on the First Amendment, which is the "instrumental" category. *See* ***Madison Teachers, Inc. v. Walker***, 2014 WI 99, ¶25, 358 Wis. 2d 1, 851 N.W.2d 337 (citing ***Roberts v. U.S. Jaycees***, 468 U.S. 609, 617-18 (1984)). The instrumental category at issue here protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment," including "the exercise of religion." ***Roberts***, 468 U.S. at 618. This category is "analytically distinct" from the Substantive Due Process-based

---

[13] An additional potential reason to assume that the circuit court here relied on one or more protected religious beliefs is the following characterization by the U.S. Supreme Court of the record in a case of approximately 40 years ago regarding at least some Amish communities:

> [T]he record in this case abundantly supports the claim that the traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living. That the Old Order Amish daily life and religious practice stem from their faith is shown by the fact that it is in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, "be not conformed to this world ...." This command is fundamental to the Amish faith. Moreover, for the Old Order Amish, religion is not simply a matter of theocratic belief. As the expert witnesses explained, the Old Order Amish religion pervades and determines virtually their entire way of life, regulating it with the detail of the Talmudic diet through the strictly enforced rules of the church community.

***Yoder***, 406 U.S. at 216. There is at least a possible connection between a religious belief in "not conform[ing] to this world" and a reluctance to contacting social workers or police, as representatives of the world outside an Amish community, regarding known acts of child sexual assault occurring inside that community. Further, the State does not provide a reason for us to think that this aspect of ***Yoder*** is outdated or could not apply here.

"intrinsic" category under the Fourteenth Amendment, which we do not address. *See* ***Madison Teachers***, 358 Wis. 2d 1, ¶25.

¶43 Again, as with religious beliefs, there is a sparse record here about alleged infringement of any particular activity for the purposes of participating in the Amish religious community. But again, for the same reasons we give above regarding other religion-related constitutional rights, we assume without deciding that the circuit court relied in part on a constitutional right to associate with a religious community—specifically, infringing on beliefs of members of the Amish community that they are not permitted to, in the words of Whitaker's argument, "interact more regularly with secular authorities," thereby "regulat[ing]" "social and moral standards of the Amish community."

¶44 Even with our assumption that the court actually relied on considerations that could potentially infringe on one or more constitutional rights, we nonetheless conclude that Whitaker does not meet the required showing by clear and convincing evidence that the court relied on an improper factor in exercising its sentencing discretion. The court identified a reliable nexus between the circumstances of the sexual assaults and the assumed constitutional rights, based on the factual premises advanced by the parties and accepted by the court, which involves the rationale of child protection. The parties do not identify and we are not aware of controlling or even persuasive case law that closely aligns with the facts here. Nevertheless, as we now explain, ***J.E.B.***, ***Fuerst***, and ***Dawson***, support affirmance on this issue.

¶45 In ***J.E.B.***, the defendant was convicted of child sexual assault. ***J.E.B.***, 161 Wis. 2d at 659. The circuit court credited and relied on evidence that J.E.B. had a collection of pornographic books that included descriptions of "adults

having sexual contact with children" and that this pornography had "fueled" the sexual assaults. ***Id.*** at 659-60. Based on the absence of evidence that the materials included any "visual depiction of children engaged in sexual activity," we concluded that the materials did not constitute child pornography, and more broadly we presumed that the materials were constitutionally protected in the absence of a judicial determination that they constituted unprotected "obscenity." ***Id.*** at 663-64. We identified the issue as whether the sentence was constitutionally invalid on the ground that there was not "some identifiable link" between J.E.B.'s constitutionally protected activity of possessing and reading constitutionally protected material and the sexual assaults. ***Id.*** at 665. We applied the ***Lemon - D.C. Circuit*** test, under which courts evaluate whether there is "a reliable showing of a sufficient relationship" between the criminal conduct at issue and constitutionally protected conduct, to conclude that the circuit court's consideration of his possession of the constitutionally protected material, in the context of his child sexual assault conviction, was not a misuse of sentencing discretion. ***J.E.B.***, 161 Wis. 2d at 659, 673 (citing ***Lemon - D.C. Circuit***, 723 F.2d at 936).

¶46 As already briefly summarized above, in ***Fuerst***, we relied on the requirement of "some identifiable link" or "reliable showing of a sufficient relationship" from ***J.E.B.*** to reverse a sentencing. ***Fuerst***, 181 Wis. 2d at 912-13. Fuerst was convicted of child sexual assault. ***Id.*** at 908. The circuit court explicitly stated that it considered Fuerst's lack of church attendance and religious convictions to be aggravating factors. ***Id.*** at 908-09. We concluded that Fuerst showed that the sentence was imposed based on unjustifiable bases, namely consideration of the defendant's religious beliefs without identification of a "reliable nexus" "between the defendant's criminal conduct and the defendant's

religious beliefs and practices." ***Id.*** at 909-10, 913. The circuit court improperly failed to limit its consideration to circumstances in which the defendant's criminal conduct was related to his "religious practices." ***Id.*** at 914.

¶47 In ***Dawson***, the Supreme Court held that the admission of evidence related to a defendant's beliefs and associations at sentencing violated the First Amendment because it had "no relevance to the sentencing proceeding." ***Dawson***, 503 U.S. at 166. The sentencing evidence at issue was Dawson's affiliation with the Aryan Brotherhood and that he had described himself as "one of Satan's disciples." ***Id.*** at 161-62. This evidence was inadmissible because it "was not tied in any way to the murder" for which Dawson was being sentenced; more generally, "the prosecution did not prove that the Aryan Brotherhood had committed [or endorsed] any unlawful or violent acts." ***Id.*** at 166. "[T]he evidence proved nothing more than Dawson's abstract beliefs," and therefore its introduction violated Dawson's constitutional rights. ***Id.*** at 167. However, the Court explained that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." ***Id.*** at 165; *see also* ***Mitchell***, 508 U.S. at 486-88 (relying on ***Dawson*** in part to hold that beliefs and associations are admissible when relevant to a legitimate sentencing factor; penalty enhancement for aggravated battery based on targeting of victim on account of race not prohibited by the First and Fourteen Amendments).

¶48 Applying the shared reasoning in these cases here yields the same result as in ***J.E.B.*** and the opposite result as in ***Fuerst*** and ***Dawson***. The circuit court here did not hold Whitaker's "abstract beliefs" against him. *See* ***Dawson***, 503 U.S. at 167. Instead, the court considered the relationship between the

circumstances of the child sexual assaults—which it found were not prevented by adults with contemporaneous knowledge and not disclosed to authorities such as social workers or police—and religious and associational rights that we assume without deciding prohibit or discourage communication with authorities about child sexual assaults under all circumstances. That is, there is a reliable nexus between the circumstances of the sexual assaults and the exercise of what we assume are constitutional rights that the sentencing court decided calls for a harsher sentence, even if the added harshness potentially infringed on those rights. *See* ***J.E.B.***, 161 Wis. 2d at 665; ***Dawson***, 503 U.S. at 166.

¶49 It is true that the court in ***J.E.B.*** noted a "congruity" between the defendant's acts of child sexual assault and his act of possessing books that included "graphic descriptions" (although not technically child pornography), and that the same kind of congruity is missing here. *See* ***J.E.B.***, 161 Wis. 2d at 673. That is, the uncontested finding of failed interventions here by adults with knowledge of child sexual assault does not closely parallel Whitaker's sexual assaults themselves. And more generally, unlike in ***J.E.B.***, ***Fuerst***, and ***Dawson***, here the evidence at issue is not relevant to show the bad character or dangerousness of the defendant being sentenced. *See* ***Dawson***, 503 U.S. at 166 ("In many cases … associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society."). Instead, here it is relevant to the legitimate purpose of protecting children from sexual assaults. Yet all that is required is a reliable nexus tied to a legitimate sentencing rationale, which does not need to be a rationale based on a likelihood of recidivism by Whitaker. Given the broad array of factors that a circuit court may rely on in the exercise of its discretion at sentencing, constitutionally protected conduct may become relevant at sentencing in many ways. In this case, as in ***J.E.B.***, we

conclude that there was a reliable basis for the circuit court to view any potential infringement on a constitutionally protected activity as a legitimate sentencing goal related to the offense of conviction. *See* ***J.E.B.***, 161 Wis. 2d at 673 (the test is not "cause and effect," but "whether there is a reliable showing of a sufficient relationship between the two").

¶50 We turn now to contrary arguments by Whitaker. One narrow argument is of the straw man type. He contends that the circuit court relied on the following propositions: "that Mr. Whitaker was prompted to sexually assault his sisters for religious reasons"; "that elders in the community deemed his [sexual assaults as] acceptable"; and "that Mr. Whitaker committed these offenses to further any illegal aims of the Amish faith or community." The court did not rely on any of these propositions. To the contrary, as the background summaries above reveal, the court explicitly repudiated these propositions.

¶51 More generally, Whitaker argues that his Amish affiliation was a "prohibited" sentencing consideration and that it was improper for the circuit court to rely on the child protection rationale to target child sexual assault "only within a closed religious community." We cannot reconcile this argument with the proper legal test involving a reliable nexus, for reasons we have explained. To the extent that singling out the Amish community for attention risked infringing on constitutional rights, under ***J.E.B.***, ***Fuerst***, and ***Dawson***, the circuit court was permitted to potentially infringe constitutionally protected behavior based on a legitimate sentencing rationale so long as it could articulate a reliable nexus to the nature of the crime.

¶52 In what he may intend to offer as a separate argument, Whitaker asserts that the sentence "improperly entangled" the secular interest of protecting

children with the religious pursuits of the Amish community and advanced "the interests of secular defendants … over those of Amish defendants." Whitaker contends that this entanglement violated one component of the three-prong test in ***Lemon - Supreme Court*** that we summarize above in footnote 5 (government action must have secular purpose; not advance or inhibit religion; not foster excessive entanglement). The excessive entanglement problem, according to Whitaker, is that the challenged rationale is aimed at influencing the "values," the "mindset," the "customs," and the "priorities of the Amish community" and "the upbringing of Amish children" and "to specifically inhibit followers of the Amish faith" and not others.

¶53 Whitaker does not even begin to develop a supported "excessive entanglement" argument. To repeat, the circuit court operated from the premise that the Amish community *opposes* child sexual assault; there could be no entanglement, in itself, in the court using a sentence to signal strong disapproval of child sexual assault. At issue is a sentencing rationale that encourages, as necessary to stop child sexual assault, potential interaction with authorities such as social workers or police in those instances in which adults become aware of actual instances of child sexual assault. It is sufficient to reject the excessive entanglement argument that Whitaker fails to explain why we should conclude that a sentence based in part on the challenged rationale here requires or dictates extensive (as opposed to only limited) communications or cooperation with government representatives, allows social workers or police to interfere with specific religious beliefs or practices, or more generally involves any sort of ongoing government monitoring of religious life in the Amish community. *See* ***Jackson v. Benson***, 218 Wis. 2d 835, 873-74, 578 N.W.2d 602 (1998) (excessive entanglement involves determining whether "'[a] comprehensive, discriminating,

and continuing state surveillance will inevitably be required to ensure that these restrictions [against the inculcation of religious tenets] are obeyed and the First Amendment otherwise respected'" (quoting ***Lemon – Supreme Court***, 403 U.S. at 619)). The court in ***Jackson*** noted that ***Lemon - Supreme Court*** recognizes that a "total separation between church and state is not possible in an absolute sense." ***Jackson***, 218 Wis. 2d at 874. Contrary to this principle, Whitaker seems to operate from the false premise that any sentencing rationale that might potentially infringe on any religious belief or associated practice necessarily represents an excessive entanglement. At best, he invites us to imagine the potential for entanglements that might become excessive.

¶54 Whitaker argues that "similarly-situated offenders raised outside of the Amish community would not be subject to the same" child protection rationale relied on by the circuit court. If Whitaker intends to raise an equal protection argument, it is thoroughly undeveloped. In any case, his argument fails to come to grips with the factual premises accepted by the circuit court. Another offender would not be similarly situated if he or she had not been raised in a community that had a pattern of failures to effectively respond to child sexual assaults.[14]

[14] On a related note, both parties make limited attempts to analogize the circumstances here to hypothetical scenarios. The State refers to hypothetical rationales that a court might apply in sentencing a generic "Catholic priest convicted of sexual assault." In his reply brief, Whitaker responds to this hypothetical by briefly suggesting that the State's position would support discriminatory sentencing of a defendant based solely on such defendant characteristics as race, sex, sexual preference, gender identity, indigence, union membership, or political views. Neither set of thinly developed comparisons assists us in applying the pertinent case law to the specific uncontested factual premises here and the specific child protection rationale articulated by the circuit court.

¶55 It does not advance Whitaker's argument to create and inject a "religious community" reference into his summary of a Hawaii court opinion on which he relies as persuasive authority. *See* ***State v. David***, 339 P.3d 1090, 1102-05 (Haw. Ct. App. 2014) (ordering resentencing because prosecutor at sentencing improperly asked court to impose harsher sentence to send a message to people of Micronesian heritage, based on the premise that male Micronesians drink to excess and commit crime), *rev'd on other grounds*, 409 P.3d 719, 731 (Haw. 2017) (holding that sentencing court erred by failing to repudiate prosecutor's improper appeal to ethnic heritage). ***David*** contains no reference to anyone's religious beliefs or practices or association for religious purposes. Instead, ***David*** deemed it prosecutorial misconduct, justifying reversal, for a prosecutor to invite a court to base a sentencing decision on sexist and racist stereotypes. And, we already know from such Wisconsin precedent as ***Harris***, 326 Wis. 2d 685, ¶33, that racial and gender stereotypes are improper sentencing factors. Racial and gender stereotypes are not at issue here.

¶56 In sum on this issue, we conclude that, to the extent that the circuit court considered facts that could potentially infringe on the rights to the free exercise of religion and free association with a religious community, this was permissible.

## II. EIGHTH AMENDMENT / DUE PROCESS

¶57 Whitaker argues that the sentence is disproportionate under the Eighth Amendment and violates the Fourteenth Amendment Due Process Clause. He contends that the circuit court failed to sufficiently take into account that he was a mere adolescent at the time he committed the sexual assaults and had apparently committed no crimes of any kind between his last child sexual assault

at age 14 and the date of sentencing. We reject this argument because the court did not violate the constitution in imposing a sentence that is a small fraction of the maximum 60-year bifurcated prison sentence available, based on a course of conduct that the court justifiably deemed "abhorrent," even when Whitaker's young age at the time of the sexual assaults is taken into account. The court explicitly struggled with the difficult challenge presented by the passage of time since Whitaker committed the offenses as a youth and the court reasonably attempted to take these circumstances into account.

¶58 The Eighth Amendment provides that "cruel and unusual punishments" may not be imposed by courts. U.S. CONST. amend. VIII.[15] Quoting from U.S. Supreme Court precedent, our supreme court has explained:

> The Eighth Amendment's prohibition against "cruel and unusual punishments" flows from the basic "'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" According to the Supreme Court, the drafters of the Eighth Amendment did not attempt to define the contours of that proportionality, leaving to future generations of judges the task of "'discern[ing] how the framers' values, defined in the context of the world they knew, apply to the world we know.'" As such, the Supreme Court has determined that a punishment is "cruel and unusual" in violation of the Eighth Amendment if it falls within one of two categories: (1) "those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted" in 1791; or (2) punishment inconsistent with "'evolving standards of decency that mark the progress of a maturing society.'"

[15] Article I, Section 6 of the Wisconsin Constitution contains substantively identical language and our analysis is guided by interpretations of the Eighth Amendment by the U.S. Supreme Court and the Wisconsin Supreme Court. *See* ***State v. Ninham***, 2011 WI 33, ¶45, 333 Wis. 2d 335, 797 N.W.2d 451.

***Ninham***, 333 Wis. 2d 335, ¶46 (alterations in original) (citations omitted).

¶59 Keying on the "evolving standards of decency" aspect of the constitutional standard, Whitaker emphasizes precedent of the U.S. Supreme Court that recognizes the importance of allowing sentencing courts "to consider a juvenile's lessened culpability due to age," so that, for example, "[p]recluding a judge from considering the characteristics of youth, and the way they weaken the rationale for punishment, can render a sentence of life without parole for intentional homicide disproportionate as to a juvenile." *See* ***State v. Barbeau***, 2016 WI App 51, ¶¶30-32, 370 Wis. 2d 736, 883 N.W.2d 520 (summarizing U.S. Supreme Court precedent involving the sentences for youthful offenders); *see, e.g.*, ***Miller v. Alabama***, 567 U.S. 460, 471 (2012) ("children are constitutionally different from adults for purposes of sentencing"); *see also* ***Ninham***, 333 Wis. 2d 335, ¶4 (determining that sentencing a 14-year-old to life imprisonment without eligibility for parole was not categorically unconstitutional). As part of this argument, Whitaker asserts that he "could not have received more than thirty days of punitive incarceration per offense" if he had been adjudicated delinquent while still underage.

¶60 We are not persuaded. Whitaker certainly identifies a number of factors that argue against a heavy sentence, including the notable finding of the circuit court that Whitaker presents "zero" risk of committing child sexual assault in the future and his youth at the times he started and stopped committing the sexual assaults. Indeed, the circuit court recognized them as such, along with other mitigating factors. Whitaker's objection is that the court did not give them the relative weights that Whitaker advocated at sentencing and advocates now. In any case, we consider the following two reasons sufficient to support our conclusion that the sentence is not constitutionally disproportionate and not "'so

excessive and unusual, and so disproportionate to the offense committed, as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances.'" *See* ***Ninham***, 333 Wis. 2d 335, ¶85 (quoted source omitted). These two considerations are sufficient to undermine Whitaker's argument that the sentence is out of step with "evolving standards of decency."

¶61 First, Whitaker downplays the gravity of the ways in which he caused harm to his younger sisters over an extended period. For example, he asserts that the record does not reflect his intent that the victims "suffer in the absence of his confession." However, the circuit court found that Whitaker used threats against A.B., and he admitted that he threatened to "make [C.D.'s] life hard" if C.D. revealed the sexual assaults, with no suggestion that he ever attempted to retract or modify any threat. He also fails to account for facts that the circuit court stressed, namely, the vast number of sexual assaults—"night after night after night," as the court summarized the facts. The court pointedly contrasted the "abhorrent" conduct here with limited youthful sexual behaviors, which might constitute violations of the criminal laws if engaged in by an adult, that a large number of adolescent males reportedly engage in.[16] Given the gravity of the conduct, the court was clear that a primary and "critical" consideration in giving Whitaker a prison sentence was "punishing Mr. Whitaker for his behavior."

[16] This was in response to a defense submission quoting an unsourced estimate "that 90% of adolescent males, ages 12-16[,] engage in some sexual behaviors that if done as an adult would constitute a sexual offense."

¶62 Second, Whitaker seemingly argues from the unsupported premise that the *only* constitutionally proportionate sentence available to the court in this multi-victim child sexual assault case was the fines-only sentence that he requested. That is, he fails to provide a basis for us to conclude that a relatively short prison term on the child sexual assault conviction, considering all of the pertinent evidence before the court, was disproportionate. Again, the circuit court explicitly displayed an appreciation for mitigating facts now highlighted by Whitaker, and accordingly reduced the sentence that would otherwise be warranted. *See* ***Barbeau***, 370 Wis. 2d 736, ¶32 (noting that constitutional concerns are satisfied when sentencing court takes "'into account how children are different'" (quoting ***Miller***, 567 U.S. at 480)).

## III. COMPLIANCE WITH *GALLION*

¶63 Whitaker acknowledges that the circuit court "identified the primary purposes of sentencing and properly articulated its rationale for a punitive goal." He contends, however, that the sentence must be vacated because the court failed to explain why, in particular, the court's stated purposes are advanced by either the two years of initial confinement or the two years of extended supervision. We now explain why we conclude that this argument largely runs afoul of the rule that a circuit court must explain only the basis for the "general range" of a sentence that it imposes in the exercise of its discretion.

¶64 Whitaker relies on statements in ***Gallion*** that "if a circuit court imposes jail or prison, it shall explain why the duration of incarceration should be expected to advance the objectives it has specified," and if it "imposes a bifurcated sentence …, it shall explain why its duration and terms of extended supervision should be expected to advance the objectives." *See* ***Gallion***, 270 Wis. 2d 535,

¶45. However, the court in ***Gallion*** proceeded to reject an argument that circuit courts are obligated to justify the specific number of years of the sentence or to describe the comparative weight applied to each sentencing factor. *See* ***id.***, ¶¶53-55. The circuit court needs to provide only explanations supporting the "general range" of the sentence imposed, and it need not explain why it decided against imposing a lesser sentence. ***State v. Davis***, 2005 WI App 98, ¶26, 281 Wis. 2d 118, 698 N.W.2d 823 (citing ***Gallion***, 270 Wis. 2d 535, ¶¶49-50, 54-55).

¶65 After the State cites this law, which appears to defeat much of Whitaker's argument, his reply brief essentially limits his challenge to the extended supervision portion of the bifurcated sentence, in light of the court's finding that Whitaker's current risk of reoffending is zero and that he had no need for rehabilitation.

¶66 It is true that the circuit court's comments were slight regarding extended supervision. For example, the court did not set any conditions of extended supervision. This may present a close question. However, bearing in mind our deferential standard of review in the sentencing area, we reject this remaining argument on two grounds.

¶67 First, the court was required to impose a term of extended supervision, lasting at least 25% of the length of the term of initial confinement. *See* WIS. STAT. § 973.01(2)(d). Thus, it was not a question of whether the court would impose a term, only how long a term it would impose.

¶68 Second, the court's comments at sentencing could be interpreted to support a reasonable rationale of providing the victims with at least two years, following Whitaker's release from confinement, of potential assistance and security provided by supervision. As noted above, the circuit court addressed the

devastating effects of Whitaker's conduct on the victims and the need for them to heal, including finding that Whitaker used threats. This was a long hidden and unacknowledged series of intra-familial sexual assaults. As noted, two of the victims advocated prison terms of two to five years after their ordeals with Whitaker.

¶69 The "zero" chance of reoffending found by the circuit court refers to the chance that Whitaker might again commit the specific crime of child sexual assault. The chances of him assaulting another child is very small. But, as to the existing victims, the court could have reasonably concluded, given its victim-related findings, that the term of supervision will be helpful and provide them with a sense of security, based on Whitaker being subject to all conditions and rules of extended supervision. Such conditions can include, for example, orders of no contact with victims, depending on circumstances as they then exist. *See* WIS. STAT. § 302.113(7) (the department may set conditions of extended supervision that do not conflict with any set by the court).

¶70 In sum, we affirm the extended supervision portion of the sentence as being consistent with victim-related comments of the circuit court. The court articulated sentencing objectives that align with assuring the victims that Whitaker would be held accountable by state authorities, to the extent permitted under rules governing supervision, for two years beyond the two-year confinement term.

## CONCLUSION

¶71 For all these reasons, we affirm the judgment of conviction and the order denying the postconviction motion.

*By the Court.*—Judgment and order affirmed.